Argued and submitted October 31, vacated in part and remanded for entry of
modified judgment December 24, 1996

Ermon Wilson SMITH
and Mary Lee Smith, individually
and as Trustees for the
Ermon Wilson Smith and Mary Lee Smith Family Trust;
and Kent Lozier and Sondra Lozier,
husband and wife,
*Respondents,*

*v.*

WALLOWA COUNTY,
a municipal corporation,
*Appellant.*

(93-12-10357; CA A90495)

929 P2d 1100

W. Eugene Hallman argued the cause and filed the brief for appellant.

D. Rahn Hostetter argued the cause for respondents. With him on the brief was Mautz Baum Hostetter & O'Hanlon.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

The trial court granted plaintiffs a permanent injunction against defendant based on a common-law nuisance theory. The injunction prohibits defendant from mining or crushing rock and from operating an asphalt plant on defendant's property adjacent to plaintiffs' properties. Defendant appeals, and we review *de novo*. ORS 19.125(3). We conclude that the permanent injunction should be modified.

In 1981, plaintiffs Loziers purchased their residence located on 1.52 acres of land in a quiet, picturesque setting near Enterprise, Oregon. Plaintiffs Smiths purchased their residence in the same locale in 1991. Plaintiffs' properties and most of the property around them were zoned exclusive farm use (EFU) and rural residential at the time. In 1990, Loziers opened a bed and breakfast business on their property.[1]

In 1991, defendant purchased properties located next to Loziers' and Smiths' properties. The properties had previously been used from 1929 to 1932 to produce marble. However, it is unclear from the record when defendant's properties were first zoned "industrial." Some gravel had been mined from the properties, but that activity had not been conducted in recent years. Also, an asphalt plant had been operated there temporarily approximately five to seven years before the date of trial.

In October 1991, defendant, through a contract with a mining and rock crushing contractor, began mining aggregate, crushing rock and storing gravel on the property. Defendant's operations occurred approximately 350 feet from the Loziers' house and about 1300 feet from the Smiths' house. Defendant continued to mine aggregate, crush rock and store gravel periodically through 1992, 1993 and 1994, and accepted a bid to do so again in the summer of 1995. Defendant usually conducted its activities from 6 a.m. to 6 p.m. and, on occasion, operated throughout the night. The mining, rock crushing and gravel storage caused dust and

---

[1] Although the record is unclear, presumably the Loziers obtained a conditional-use permit for their business.

dirt to escape from defendant's property and to invade the Smith and Lozier properties. Also, the noise from the mining, rock crushing and gravel storage operations was loud. The trial court, in describing a 1992 videotape of the gravel operation admitted into evidence, noted:

> "The Court viewed the video tapes of the rock crushing operation. The dust is substantial. The track vehicles being operated on the county property, together with the noise and dust one can see, eerily resemble a CNN tape of tracked armored vehicles moving through the Far East desert. It is hard to imagine that all of this noise, dust, and particulate is coming through Wallowa County."

In July 1992, defendant also began operating an asphalt plant with its mining and rock crushing operation. It purchased the asphalt plant in Montana for $197,250, dismantled it, transported it to Oregon and assembled it on the land next to plaintiffs' properties. While in operation each summer, the asphalt plant emitted fumes that caused an overwhelming odor to inundate the neighboring properties. The fumes smelled like diesel exhaust. They caused headaches and possibly the outbreak of hives to one member of a nearby family. The fumes also caused the Smiths, Loziers and other adjacent property owners to keep their windows closed during the summer months. Even with the windows closed, the odor still invaded their residences. Also in 1992, the Oregon Department of Environmental Quality (DEQ) issued defendant two noncompliance notices for violating air quality standards and for creating a nuisance on neighboring properties.

In addition, defendant's operations generated a considerable amount of truck traffic beginning about 6:15 a.m. each morning. Trucks loaded with gravel and asphalt regularly left and returned to defendant's property, producing additional dust, noise and odors that invaded plaintiffs' properties. The trucks passed directly by plaintiffs' residences. Members of the Smith and Lozier families developed respiratory problems as a result of defendant's operations and both families are no longer able to enjoy the outdoors on their properties while the rock crushing and asphalt plants are functioning. Defendant does not disagree about the severity

of the odor and noise in 1992 and concedes that, had conditions continued as they existed in 1992, an injunction would be warranted.

In 1993, plaintiffs filed the complaint in this case, seeking to enjoin defendant's operations. The matter went to trial in the spring of 1995. At trial, defendant's representative, Verne Russell, testified that, for economic reasons, it was best to locate the asphalt plant near the rock crusher. He said that the county leases about eight other gravel pits throughout Wallowa County and that it did not locate the asphalt plant at the alternative sites because they did not have a water supply. However, he conceded that defendant might be able to drill a well to create a water supply at one of those sites.[2] At trial, defendant's chief contention was that, although the conditions that existed in 1992 deprived plaintiffs of the enjoyment of their property in 1992, those conditions had since been abated by remedial measures and were no longer severe enough to warrant a permanent injunction.

On appeal, defendant first argues that "plaintiffs did not sue defendant for common law nuisance" but only "alleged violations of air quality standards and zoning laws." Defendant continues, "[P]laintiffs mysteriously transformed their case into a common law nuisance case" without pleading that theory. Defendant's argument is somewhat of a mystery to us inasmuch as defendant's counsel acknowledged to the trial court during opening statement and closing argument that plaintiffs were proceeding under a common-law nuisance theory.[3] We are persuaded by our review that such a theory was tried by the consent of the parties, express or implied. ORCP 23 B.[4]

---

[2] Defendant drilled a well at the current site.

[3] We do not address whether defendant may have had a defense under the Oregon Tort Claims Act (OTCA). ORS 30.260 *et seq*. Defendant did not raise such a defense. Before the OTCA was enacted, the Oregon Supreme Court held that municipal corporations were treated similarly to nonpublic body defendants regarding common-law nuisance cases. *Wilson v. City of Portland*, 153 Or 679, 685-86, 58 P2d 257 (1936); *see also Thornburg v. Port of Portland*, 233 Or 178, 193-94, 376 P2d 100 (1962) (holding that under a common-law nuisance theory, the plaintiffs could be entitled to inverse condemnation of their property).

[4] ORCP 23 B provides, in part:

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."

■ Defendant next argues that no nuisance existed after 1992 and that the permanent injunction was inappropriate under the circumstances. Because an injunction is an extraordinary remedy, it will be granted only on clear and convincing proof of a nuisance. *Jewett v. Deerhorn Enterprises, Inc.*, 281 Or 469, 473, 575 P2d 164 (1978). When analyzing whether a nuisance exists, we first determine whether there is a substantial and unreasonable interference with the use and enjoyment of land. *Id.* at 477; *York et ux v. Stallings et al*, 217 Or 13, 20-21, 341 P2d 529 (1959).[5] Moreover, whether a particular use of property constitutes an actionable nuisance cannot be determined by fixed general rules but depends on the individual facts of the particular case. Oregon courts have considered a number of factors to assess whether a nuisance exists, including: (1) the location of the claimed nuisance; (2) the character of the neighborhood; (3) the nature of the thing complained of; (4) the frequency of the intrusion; and (5) the effect upon the enjoyment of life, health and property. *Jewett*, 281 Or at 473; *York*, 217 Or at 20.

We reject defendant's argument in part. As to the asphalt plant, there was a significant amount of evidence regarding the effect of its operation in 1994. Several witnesses testified that the odor was very strong during all three years that the plant operated. One of the exhibits is a videotape that portrays the asphalt plant operation in 1994. The plant emits a gray plume of smoke from its stack, and there is also a considerable amount of noise emanating from the plant, trucks and front loader. The person taping the video describes the smell as "overpowering."

Defendant counters that "for the 65 years prior to trial, the land in question had been used only for purposes involving the mining or processing of rock" and, thus, the industrial use predates plaintiffs' residential use of the property. However, the evidence demonstrates that, although there had been some gravel mining on the property, the properties had not been used most of the time for that purpose. Moreover, defendant did not begin its operation until 1992, nearly 11 years after the Loziers purchased their property

---

[5] *See Lloyd Corporation v. Whiffen,* 307 Or 674, 698-701, 773 P2d 1294 (1989) (Carson, J., dissenting), for an instructive description of common-law nuisance.

and two years after the Smiths purchased their property. Also, defendant's use is a much larger operation than any other mining operation that had taken place previously.

As to the actual effect on plaintiffs' properties, they will endure overwhelming odors and noise if the asphalt plant is permitted to operate. They will be unable to open their windows during the summer and to enjoy the outdoor use of their property. Moreover, the odors cause headaches and other physical problems. Trucks loaded with asphalt will regularly depart and return to defendant's properties during the summer months, producing additional dust, noise and odors. Our review of the evidence persuades us that defendant's asphalt operation continued to create dust, loud noise and noxious odors even after defendant undertook its remedial measures. We agree with plaintiffs that defendant's activities constitute a substantial and unreasonable interference with the use and enjoyment of their property.

■ Because plaintiffs have demonstrated that defendant's asphalt plant operation constitutes a nuisance, we must decide whether a permanent injunction is the appropriate remedy. In *Jewett*, the court stated:

> "When a nuisance is established the form and extent of the relief designed to abate the nuisance is within the discretion of the court. In exercising that discretion the court may refuse an injunction where the hardship to the defendant by a permanent injunction greatly outweighs the benefit resulting to the plaintiffs." 281 Or at 478.

Defendant argues that the operation of the asphalt plant is "a public use to provide roads in the most isolated county in the State of Oregon." We agree that the record shows that the asphalt plant is important to the county's economy and to the county's citizens. It provides jobs for county workers, and it also saves the county money in that it can operate its own asphalt plant, thereby reducing the cost of obtaining asphalt for county roads. Obviously, the maintenance of public roads is in the public interest. However, if a permanent injunction is entered, defendant is not precluded from producing asphalt at another location. There is some testimony in the record from which it can be inferred that the cost of moving the plant from its present site would be

approximately $65,000. Also, defendant could purchase asphalt from private sources. As the Supreme Court said in *Jewett,*

> "[t]he difficulty in applying the comparative injury analysis to this situation is that there is no middle ground. If the nuisance is to be abated there appears no practical alternative to a permanent injunction, the result being that defendant suffers financial loss. If the injunction is not given plaintiffs must endure or move away." 281 Or at 479.

The same can be said of this situation. If a permanent injunction is granted, defendant will suffer some financial loss. However, the injuries to plaintiffs constitute a pervasive and almost complete interference in the day-to-day use and enjoyment of their residences when the asphalt plant is operating. We conclude that the financial loss that defendant could suffer as a result of a permanent injunction does not outweigh the detriment that plaintiffs incur if the asphalt plant is allowed to continue to operate. The trial court properly held that defendant should be permanently enjoined from operating its asphalt plant on its property.

The evidence regarding the effect of the mining of gravel and rock crushing after 1992 is less persuasive. Since 1992, the county has undertaken measures to cut down on the amount of dust and noise. We cannot determine from the evidence how effective those measures will be in the absence of the operation of the asphalt plant. Because of the lack of evidence in the record regarding the effect of the rock crushing operation alone after 1992, plaintiffs have not carried their burden of persuasion regarding permanent injunctive relief against the rock crushing operation. It could be that the rock crushing operation could be carried out at times and in a manner that will not interfere with plaintiffs' use of their properties. Should defendant resume rock crushing activities on its properties to the extent that plaintiffs consider the activity a nuisance, they will have to seek additional injunctive relief.

■ Finally, defendant assigns as error the trial court's refusal to hold a supplemental hearing after it rendered its initial opinion. In the trial court's memorandum opinion, it

invited defendant to present additional evidence on mitigation. Defendant then moved for a supplemental hearing, and plaintiffs objected. At the request of the trial court, the parties submitted supplemental memoranda on whether the trial court should allow a supplemental hearing on mitigation. Ultimately the trial court denied defendant's request for a supplemental hearing.

■          Defendant argues that we should review the trial court's decision to deny defendant's request for a supplemental hearing as a question of law. Specifically, it argues that the trial court did not exercise the discretion it had to grant or deny the request because it wrongly concluded that it was without the authority to hold such a hearing. The record does not support defendant's argument. The trial court adopted the reasoning in plaintiffs' supplemental memorandum in opposition to defendant's motion. This record establishes that the trial court understood that it could hold a supplemental hearing, but then it exercised its discretion not to hold such a hearing. Thus, we review the trial court's decision to deny defendant's request for a supplemental hearing for abuse of discretion. *Hoag and Hoag*, 122 Or App 230, 233, 857 P2d 208 (1993). In this case, the record supports the trial court's conclusion that a supplemental hearing was unnecessary in the light of evidence at trial that established that further mitigation of the effects of the asphalt plant was not a viable option. Accordingly, the trial court did not abuse its discretion.

          Judgment for permanent injunction vacated; remanded for entry of modified judgment in accordance with this opinion.