Argued and submitted September 25, 2003, affirmed January 28, 2004

Glen D. MARK
and Teri L. Powers,
*Respondents,*

*v.*

STATE OF OREGON,
on behalf of the
Department of Fish and Wildlife;
and State of Oregon,
on behalf of the
Division of State Lands,
*Appellants,*

*and*

NATURIST ACTION COMMITTEE,
a National Association,
*Intervenor-Below.*

96-2019; A114713

84 P3d 155

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for appellants. With him on the opening brief were Hardy Myers, Attorney General, and Michael D. Reynolds. With him on the reply brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Glen D. Mark argued the cause for respondents. On the brief were Teri L. Powers and Powers & Mark.

Before Haselton, Presiding Judge, and Wollheim and Brewer, Judges.

HASELTON, P. J.

**HASELTON, P. J.**

Defendants, the State of Oregon Department of Fish and Wildlife (ODFW) and Division of State Lands (DSL), appeal from a judgment issuing a permanent injunction in an action for a nuisance. DSL owns, and ODFW leases and manages, property including a public beach adjacent to plaintiffs' property on Sauvie Island. The trial court (1) determined that the intrusive presence and behavior of nude sunbathers using the public beach and ODFW's failure to "regulate or otherwise exercise control" over certain aspects of that use constituted a private nuisance; and (2) issued a permanent injunction requiring ODFW to abate the nuisance. On appeal, defendants challenge both the trial court's finding of a private nuisance and the scope and content of the injunction. We review *de novo*, ORS 19.415(3), and affirm.

We find the material facts to be as follows: Sauvie Island, which consists of approximately 24,000 acres of land and lakes, is located at the confluence of the Willamette and Columbia Rivers.[1] While the southern half of the island is privately owned, the northern half of the island consists almost exclusively of the 12,000-acre Sauvie Island Wildlife Area (wildlife area), which is owned by DSL and leased and managed by ODFW. On the entire northern half of the island, there are only three privately owned beach-front parcels, including plaintiffs' property. Plaintiffs' 10-acre parcel, which is located approximately three-and-one-half miles south of the northern tip of the island, is surrounded by the wildlife area.

Since the 1970s, beach areas on the eastern shore of Sauvie Island have been used for nude sunbathing. As that use gained popularity in the 1980s, use by nude sunbathers spread along the length of the beach, including to that portion of the beach that is adjacent to plaintiffs' property.

---

[1] At the point where the island is situated, about ten miles northwest of downtown Portland, the Columbia, rather than running from east to west, has curved so that its direction is generally south to north. Accordingly, as shown in the map that is Appendix "A" to this opinion, which depicts the locations of plaintiffs' and defendants' properties, the east shore of Sauvie Island, where plaintiffs' property is located, faces the Columbia's main channel.

Plaintiffs' predecessor in interest was Al Havlik. Although the record is unclear as to the precise timing, it appears that in the late 1980s Thomas Goodwin, a real estate agent acting on Havlik's behalf, unsuccessfully negotiated with ODFW about the state's possible acquisition of Havlik's property for inclusion in the wildlife area.[2] During the course of those discussions, Goodwin spoke with Ray Johnson, ODFW's wildlife area manager. Goodwin was unaware that nude sunbathers used the beach and wildlife area property adjacent to the Havlik property, and Johnson, who was aware of that use, did not mention it.

In 1989, Goodwin, on behalf of Havlik, submitted an application to the Columbia County Planning Commission for a conditional-use permit that would allow a house to be built on the Havlik property. ODFW opposed that application and expressed its opposition in a letter dated September 21, 1989, that was written by Johnson and signed by his regional supervisor. That letter read, in pertinent part, as follows:

"Since we have a large wildlife management area on adjacent lands, we have some concerns with allowing a conditional use permit that could lead to residential development on this tax lot. These concerns follow:

"1.  The parcel is surrounded by land owned by either our Department or the Division of State Lands and the beach areas fronting the Columbia River are heavily used by recreationists, particularly during the summer months. If the property were developed for residential use, we are convinced the residents would be severely harassed by trespassers. The ODFW does not have the ability to strictly enforce trespass laws. Should development proceed on this tax lot, all trespass concerns will have to be referred to the Columbia county sheriff for resolution.

"2.  Establishment of residences within areas of wildlife habitat invariably leads to conflict. These conflicts take the form of livestock escaping and damaging waterfowl [and] food crops and dogs or other pets harassing, chasing, and sometimes killing wildlife on the management area.

---

[2] The record does not disclose when Havlik acquired the property or whether he actually ever visited it.

"3.  We provide public hunting on wildlife area lands near
this tax lot. Potential residents should be alerted to the
fact that they may see hunters and hear the discharge
of shotguns through much of the fall and winter during
authorized hunting seasons. Experience has shown
that this can be annoying to some nearby residents."

ODFW's letter did not include any mention of public nudity,
nude sunbathing, or any other nudist-related activities on
the public land surrounding the Havlik parcel.

Thereafter, in late 1989, plaintiffs, who were living
in Alaska, contacted Goodwin and expressed interest in pur-
chasing the land. Goodwin mailed them maps of Sauvie
Island, the approved conditional-use permit, and a copy of
the ODFW letter in opposition. Plaintiffs were concerned
about the ODFW letter and, consequently, plaintiff Teri
Powers questioned Goodwin about the popularity of the
beach and the potential problem of trespassers. Goodwin sug-
gested that, although the beach was popular in the summer
months, a fence would keep trespassers out. Powers also con-
tacted Johnson and spoke directly with him about ODFW's
concerns. Johnson told Powers that the beach in front of the
property was a popular recreation spot and that he believed
that they would be harassed by people cutting through the
property and parking cars in the surrounding area. Johnson
did not mention nudity to Powers, much less describe the
nature and extent of the use of the adjacent beach and wild-
life area by nude adults.[3]

In the winter of 1989-90, plaintiffs flew to Oregon to
visit the property with Goodwin. During that visit, and while
on the property and beach adjacent to the property, plaintiffs
did not see any nude people, any signs that indicated that
nude activity was permitted on the beach, or any other evi-
dence of such use. In February 1990, plaintiffs purchased the
property. Plaintiffs would not have acquired the property if
they had known that public nudity was permitted and per-
vasive on the adjacent beach.

_____

[3] In an affidavit, which was admitted by stipulation at trial, Johnson stated
that he had told Powers that the beach was frequently used by nude sunbathers.
Powers denied that there had ever been such a disclosure. The trial court adopted
Powers's account as being more credible, and, as described below, 191 Or App at
576-77, we subscribe to that assessment.

In June 1990, plaintiffs moved to the island. They planned to live on the property in a camper, initially, and to spend that summer relaxing on the beach. The day after plaintiffs arrived, they were shocked to find nude sunbathers on the beach in front of their property. That was just the beginning. In the weeks that followed, a large number of beach users—both clothed and naked—crossed plaintiffs' property, parked on and around their property, and walked along the road leading to plaintiffs' property in various stages of dress and undress. In addition, some beach users engaged in explicit sexual conduct in plaintiffs' visual presence. Plaintiffs spent much of that first summer asking beach users to wear clothing while in front of their property, posting "no trespassing" signs, and cautioning people not to cross their land or block their driveway.

Despite plaintiffs' efforts, the problems did not abate. Over the next decade, plaintiffs and their guests, family, and friends saw and encountered hundreds—and perhaps thousands—of nude adults around their property. During the warmer months, as many as a hundred nude adults could be seen each day. Aside from that pervasive and intrusive nudity, plaintiffs and their guests also witnessed many instances of explicit sexual conduct on and around their property. Specifically, they saw adults engaged in sexual intercourse, oral sex, the touching of genitals and breasts, men masturbating individually and in groups, men walking on the beach and on the road with erections, and individuals photographing others' genitals. Those incidents occurred at least a dozen times a year—totaling more than a hundred times over the decade.

Plaintiffs attempted to use a variety of means to eliminate those problems. The response by beach users was generally uncooperative, and sometimes overtly hostile. Most nude people that plaintiffs encountered on their property, the beach, or the road, refused to put on clothing. Plaintiffs' property and the signs that they hung were repeatedly vandalized. One person told plaintiffs that the beach users were organized and militant, and threatened plaintiffs if they continued to try to make nude beach users go around their property. Plaintiffs complained to Johnson, but he was unresponsive.

In January 1993, three years after plaintiffs purchased the property, ODFW adopted the Sauvie Island Wildlife Area Management Plan (management plan). That management plan defines the "mission and purpose" of the wildlife area as being "to provide suitable habitat for waterfowl." The management plan also recognizes that "[t]he beaches along the Columbia River have grown in popularity to include many uses that are not wildlife oriented recreation" and directs ODFW to "search out ideas on how to regulate this use," including the discouragement or elimination of "incompatible recreational activity." As part of an effort to implement the directives of the management plan, in September 1993, ODFW adopted the Sauvie Island Wildlife Area Beach Use Plan (beach use plan).

The beach use plan, for the first time, separated Sauvie Island's eastern (Columbia River) beach into distinct, separately named beaches. The only beach designated under the plan as a "clothing optional" (aka nudity permitted) beach is Collins Beach. As shown on Appendix A, Collins Beach immediately adjoins plaintiffs' property, except that there is a 425-foot "buffer zone" between the properties. Thus, of all the beach frontage within the wildlife area— several miles along Sauvie Island's Columbia River shore— ODFW placed the sole nudity-permitted beach right next to plaintiffs' property.

Under the terms of the beach use plan, public use in the "buffer zone" is to be excluded from Memorial Day weekend through Labor Day, inclusive. In addition to creating the summertime "buffer zone," the beach use plan also provides that cottonwoods and shrubs will be planted in the buffer zone, that appropriate signage, including "user-friendly" and "vandal-resistant" signs informing users of the boundaries of the "clothing optional" beach, shall be posted, and that coordinated law enforcement patrols of the area will be maintained.

The parties dispute the extent of ODFW's efforts to implement and enforce various provisions of the beach use plan with respect to Collins Beach. Like the trial court, we find, on *de novo* review, that those efforts were minimal and ineffective. ODFW installed signs on the road and put posts

on the beach to mark the boundaries of the "clothing optional" area, but those efforts were largely undermined by vandals, who persistently damaged or removed the signs. As a result, and notwithstanding the signs that remained, many nude beach users crossed the northern boundary of Collins Beach. Beyond that, ODFW largely abdicated enforcement of the buffer zone and regulation of public sexual activity. Despite the beach use plan's directive to "[e]xplore methods to control and regulate beach use to assure that such use * * * does not unreasonably deter, distract, or hinder others in the peaceable enjoyment of the area," ODFW essentially depended on voluntary compliance by beach users. Indeed, although ODFW contracted with Columbia County for the services of a deputy sheriff, neither that deputy nor any of the ODFW employees working on the island was detailed to monitor and enforce compliance with the Collins Beach boundaries.

Other aspects of the beach use plan also were not implemented. Because of soil conditions and high waters, ODFW was unable to plant the prescribed screen shrubbery in the buffer zone. Further, ODFW did not use any form of media to publicize the creation of the Collins Beach boundaries or update a publicly distributed brochure of the area to reflect those changes. In sum, the beach use plan as implemented—or not implemented—did not meaningfully mitigate the conflict with plaintiffs' use and enjoyment of their property. Pervasive and intrusive adult nudity within plain view of plaintiffs' property and on the road leading to plaintiffs' property continued unabated. Beach users continued to trespass on plaintiffs' property with impunity and to freely engage in explicit sexual conduct either on plaintiffs' property, in the buffer zone, or on Collins Beach within sight of plaintiffs' property. Indeed, after a brief initial decline of objectionable activities following the beach use plan's adoption, the number of incidents returned to the same level that it had been before the plan's adoption.

In February 1996, plaintiffs first filed this action, alleging claims against the state for private nuisance, public nuisance, and inverse condemnation, seeking injunctive relief and damages. In March 1997, the trial court dismissed

plaintiffs' claims as being barred by discretionary immunity. ORS 30.265(3)(c). Plaintiffs appealed, and we affirmed in part and reversed in part. *Mark v. Dept. of Fish and Wildlife*, 158 Or App 355, 974 P2d 716, *rev den*, 329 Or 479 (1999) (*Mark I*). While we agreed with the trial court that discretionary function immunity precluded any recovery of damages, *id.* at 369, we also held that, under the Supreme Court's intervening decision in *Penland v. Redwood Sanitary Sewer Service Dist.*, 327 Or 1, 956 P2d 964 (1998), plaintiffs were not similarly precluded from obtaining injunctive relief. *Mark I*, 158 Or App at 365. Thus, we remanded plaintiffs' private nuisance and public nuisance claims for trial and, if appropriate, the issuance of injunctive relief. *Id.* at 371.

On remand, the court rejected plaintiffs' public nuisance claim but determined that plaintiffs had proved the existence of a private nuisance. In a thoughtful and comprehensive letter opinion, the trial judge commented:

"What I found most disturbing was the sheer number of incidents that plaintiffs experience on a routine basis of nudity and sexual activity viewable from their property. [ODFW] has been aware for years that [plaintiffs have] been forced to limit their outside activity to avoid these unpleasant encounters. Plaintiffs estimate that they and their guests witness at least a dozen sex acts per year from their property and that this has been consistent throughout the 10 years they have owned this property. It is this frequency coupled with the obvious aversion plaintiffs and most other persons have to such activity that creates a nuisance. * * *

"The issue of nudity by itself is a more difficult issue. If nude beach users would remain in designated areas and if proper screening or landscaping were developed, I question if a problem would exist. During warmer months plaintiffs are subjected to daily displays of nudity. Most of these sightings occur as individuals or groups stroll past plaintiffs' property. There is further difficulty in that a significant number of nude sunbathers become hostile toward plaintiffs' advising them they are outside the designated area.

"Both of the above activities interfere with plaintiffs' desire to enjoy their home as we all do: to entertain, to

relax, to spend time in our yards, and in plaintiffs' case on their beach. Plaintiffs have the right to enjoy their property without the constant intrusion of in their face nudity and illegal sexual conduct. Defendant has taken only the most limited steps to address this problem.

"I find by clear and convincing evidence that a private nuisance exists as to regular intrusive nudity which is visible from plaintiffs' property. I find the same as to the numerous episodes of illegal sexual conduct occurring on defendant's property which is observable from plaintiffs' property."

After a further hearing, the court issued a permanent injunction requiring ODFW to abate the nuisance. Specifically, the injunction ordered ODFW to (1) "establish a buffer of sufficient length to avoid viewing of nude sunbathers on Collins Beach from plaintiffs' real property"; (2) "adequately staff the area in and around plaintiffs' property to adequately police compliance with the nude beach boundaries and address incidents of public sexual behavior"; (3) "sufficiently sign the North boundary of the designated nude-portion of Collins Beach to alert beach users of the boundary," including using "vandal-resistant" signs as provided in the beach use plan; and (4) comply with the beach use plan, "including the planting of vegetation in the buffer area and preparation of a suitable pamphlet."

■ ■   On appeal, defendants raise two assignments of error: (1) The trial court erred in finding that plaintiffs had proved the existence of a private nuisance warranting the issuance of permanent injunctive relief; and (2) in all events, the injunction was impermissibly directive, offending principles of separation of powers. In particular, with respect to their first assignment of error, defendants argue that, because the beach adjacent to plaintiffs' property has historically been used as a nude beach, that use could not give rise to a private nuisance; that plaintiffs had either actual or constructive knowledge of the nude beach before purchasing their property and, thus, "came to the nuisance"; and that, in all events, ODFW's efforts to control the activity on the beach and in adjacent areas pursuant to the beach use plan and otherwise were reasonable.

"A private nuisance is an unreasonable non-trespassory interference with another's private use and enjoyment of

land." *Mark I*, 158 Or App at 360. Thus, in determining whether the adjacent nude beach and associated uses constituted a private nuisance, we begin with whether there was a "substantial and unreasonable interference" with plaintiffs' enjoyment of their property. *Smith v. Wallowa County*, 145 Or App 341, 346, 929 P2d 1100 (1996). That inquiry "depends on the individual facts of a particular case" and requires "clear and convincing" proof. *Jewett v. Deerhorn Enterprises, Inc.*, 281 Or 469, 473, 575 P2d 164 (1978). Five "guidelines" frame our inquiry:

> "(1) the location of the claimed nuisance; (2) the character of the neighborhood; (3) the nature of the thing complained of; (4) the frequency of the intrusion; and (5) the effect upon the enjoyment of life, health and property."

*Smith*, 145 Or App at 346; *see also Jewett*, 281 Or at 473; *Penland*, 156 Or App at 315.

■ The gravamen of plaintiffs' private nuisance claim is that defendants, who own and control the adjacent land, have failed to adequately control the conduct of their invitees. As we explained in *Mark I*, owners of land who do not themselves engage in activity constituting a nuisance may nevertheless "be liable for the acts of third parties that create a nuisance on their land" if they both "know that the activity is being carried on and will involve an unreasonable risk of causing the nuisance" and "consent to the activity or fail to exercise reasonable care to prevent it." *Id.* at 362 (citing *Restatement (Second) of Torts* § 838 (1979)). Here, plaintiffs have proved both of those prerequisites.

■ The acts of defendants' invitees created a nuisance on defendants' land. In *Mark I*, we left open the question of whether "mere nudity" might constitute a nuisance. *Id.* at 361.[4] Nevertheless, as we further explained in *Mark I*, proof of "uncontrolled and intrusive nudity occurring on the area

---

[4] We observed:

"We have not found any Oregon case that indicates that nudity in itself, with no clear sexual component, constitutes a nuisance. On the one hand, public nudity is not illegal unless it occurs with the intent of arousing the sexual desire of either the actor or another person. *See* ORS 163.465. On the other hand, an activity that is otherwise legal may still constitute a nuisance."

158 Or App at 361.

immediately around [plaintiffs'] property" would allow findings that the nudity constituted a nuisance. *Id.* In addition, proof that sexual activity had routinely occurred on defendants' property and that, because of the proximity of plaintiffs' property, that activity had impaired plaintiffs' use and enjoyment of their property would also establish a private nuisance. *Id.* at 361-62.

Here, plaintiffs' proof established much more than "mere nudity." Rather, the record demonstrates that, for more than a decade, plaintiffs were confronted with "uncontrolled and intrusive nudity," *id.* at 361, on sunny or warm days. Hundreds, and perhaps thousands, of naked adults engaged in various activities on defendants' property in plain view of plaintiffs' property. At least a dozen times a year, plaintiffs or their guests saw adults engaged in explicit sexual conduct on defendants' property and, occasionally, on plaintiffs' property. On other occasions, plaintiffs encountered nude beach users trespassing on their property or walking on the public road leading to plaintiffs' property.

That conduct substantially and unreasonably interfered with plaintiffs' ability to use and enjoy their property. Plaintiffs consciously avoided that portion of their property adjoining Collins Beach in order to limit viewing and confrontation with nude beach users. As of the time of trial, plaintiffs still had not built a house on their land because they "just don't know if [they are] ever going to get any relief from the public nudity." Plaintiffs' friends and family, especially those with children, were unwilling to visit them on their property for fear of exposure to the intrusive nudity and sexual activities—and, as a result, plaintiffs' ability and willingness to have social gatherings was greatly limited. Finally, plaintiffs were forced to expend substantial time and energy trying to dissuade nude adults from trespassing on their property and engaging in sexual conduct on and near their property. As the trial court observed, the activities of beach users on and around plaintiffs' property substantially "interfere[d] with plaintiffs' desire to enjoy their home as we all do."

■ Defendants argue, nevertheless, that plaintiffs cannot prevail on their private nuisance claim because the use of the adjacent beaches by nude sunbathers was historically

well established and because plaintiffs "came to the nuisance." We first reject defendants' "well-established historical use" argument for several reasons. Contrary to defendants' premise, the record here does not demonstrate that pervasive and intrusive nude activity of the nature and intensity that plaintiffs encountered had existed on the adjacent property, including Collins Beach, for years before plaintiffs acquired their property. The record shows that some nude sunbathing and related activities had occurred somewhere on Sauvie Island's Columbia River shore since sometime in the 1970s. However, such anecdotal evidence was imprecise as to the location and intensity of that activity. Although there is more particular evidence as to nude sunbathing activities, including the proliferation and intensification of those activities, on or in the vicinity of Collins Beach in the 1980s, that latter-day activity hardly rises to the level of a long established "historical use." *Accord Hay v. Dept. of Transportation*, 301 Or 129, 142, 719 P2d 860 (1986) (parking on beach was not a private nuisance because, in part, the "history of vehicular traffic on the beach," which dated back over 80 years, "demonstrates that the parking * * * was not unreasonable as a matter of law"). Indeed, defendants' apparent suggestion that the preexistence of an activity, if even for only a few years, precludes a finding of nuisance would effectively immunize many nuisances—and is, as nearly as we can tell, unsupported by any Oregon authority.

■ Defendants next invoke the closely related concept of "coming to the nuisance." Unlike defendants' *per se* "well-estabished historical use" argument, which does not depend on any actual or constructive knowledge on plaintiffs' part, "coming to the nuisance" is inapposite unless plaintiffs had actual or constructive knowledge of the objectionable activity before they acquired their property. *See, e.g., E. St. Johns Shingle Co. et al. v. Portland*, 195 Or 505, 527, 246 P2d 554 (1952).

■ Here, defendants' "coming to the nuisance" argument fails for either of two reasons. First, "coming to the nuisance" is not an absolute and preclusive doctrine; rather, it is simply one of a variety of material considerations in determining the existence of a nuisance and the proper remedy, if

any. Under Oregon law, "[t]he prior existence of an objectionable condition is *one factor to be considered* in determining whether a nuisance exists." *Spencer Cr. Pol. Con. v. Org. Fertilizer*, 264 Or 557, 561, 505 P2d 919 (1973) (emphasis added). Thus, even if defendants could demonstrate that plaintiffs knowingly "came to the nuisance," that fact, while pertinent, would not be dispositive. *Accord Jewett*, 281 Or at 475 (where plaintiffs had not "come to the nuisance," the court would take "a less favorable view of defendant's case than it might have been disposed to take if this business had been maintained in the neighborhood for a long period of time" (quoting *Kramer v. Sweet*, 179 Or 324, 331, 169 P2d 892 (1946)) (internal quotation marks omitted)).

Second, in all events, defendants cannot demonstrate that plaintiffs "came to the nuisance," because they cannot establish that plaintiffs had the requisite prior knowledge. That is, plaintiffs did not have actual or constructive knowledge that any nude sunbathers used the adjacent property, much less any knowledge of the nature and intensity of such use.

Plaintiffs had no prior actual knowledge that nude sunbathers used defendants' property. ODFW's agent, Johnson, stated in an affidavit that he had informed plaintiff Teri Powers of such use, but Powers testified that Johnson never disclosed that use to her and that, if he had, plaintiffs would never have acquired the property. The trial court adopted Powers's testimony as credible: "The most credible evidence is that plaintiffs were unaware that they were purchasing property next to a nude beach." We give that determination "great weight," *Jewett*, 281 Or at 473, and concur in the trial court's assessment.[5]

■ We turn, then, to constructive knowledge. Constructive knowledge exists when a person is aware of "information as would lead a prudent man to believe that the fact existed, and that if followed by inquiry must bring knowledge of the fact home to him." *Tucker v. Constable*, 16 Or 407, 409, 19 P 13 (1888). Thus, for example, plaintiffs in this case would

---

[5] Even without such deference, in the totality of the circumstances, we would accept Powers's account as more plausible. It is not plausible that plaintiffs would have purchased the property knowing of the proximity of the nude beach.

have had constructive knowledge if they had learned before purchasing their land that there was a nude beach *somewhere* on Sauvie Island. Such information, "if followed by inquiry," could reasonably have disclosed the fact that the beach abutting the property that plaintiffs intended to purchase was used as a nude beach.

■ Here, defendants do not contend that plaintiffs had that sort of prior constructive knowledge. Rather, defendants posit a more attenuated, or expansive, formulation of "constructive knowledge." In particular, defendants assert that we should impute to plaintiffs constructive knowledge of the nude beach and associated activities because they possessed information that should have caused them to ask *general* questions about activity on the island—and such questions, in turn, would have yielded information about the existence of the nude beach. Defendants rely particularly on Johnson's 1989 letter to the Columbia County Planning Commission opposing the conditional-use permit and argue that, because plaintiffs had seen that letter, including Johnson's reference to the potential that residents "would be severely harassed by trespassers," plaintiffs should be imputed with constructive knowledge of the nude beach because questions about the "trespassers" would reasonably have disclosed the existence of the nude beach.

Defendants' constructive knowledge argument fails for any of several reasons. First, we are unaware of any Oregon authority endorsing defendants' attenuated approach to constructive knowledge. It is one thing to impute constructive knowledge when a party has knowledge of facts that reasonably should have alerted that party to the existence of other facts or, at least, to inquire about the possible existence of such facts. *See, e.g., Tucker; cf. Hoffman v. Freeman Land and Timber, LLC*, 156 Or App 105, 112, 964 P2d 1144 (1998), *rev'd on other grounds*, 329 Or 554 (1999) (existence of "no trespassing" signs, standing fence, presence of cattle, signs of timber thinning, and presence of ranch hands gave the plaintiff constructive knowledge of the defendant's adverse possession). It is quite another thing to ascribe constructive knowledge when nothing should have alerted a party to inquire about particular facts, but generic inquiries might have yielded responses revealing that information.

Indeed, if defendants were correct, a home purchaser could be charged with constructive knowledge of dry rot or a leaky roof merely because he or she failed to ask general questions about the structure's condition that might have disclosed those defects. We decline to go so far.

Beyond that, nothing in Johnson's 1989 letter to the Columbia County Planning Commission would reasonably have alerted a reasonable person to ask about nudity. That letter refers to "trespassers" and dwells at some length, and in some detail, about anticipated conflicts between any proposed residence and current recreational uses. *See* 191 Or App at 566-67 (quoting letter). The letter highlights pets "harassing" wildlife and the potential aesthetic "annoy[ance]" that might result from seeing hunters and "hear[ing] the discharge of shotguns." But not once did ODFW mention nudity, nude sunbathers, or a nude beach. We cannot, and will not, speculate on the reasons for ODFW's reticence in that respect. But we do find it incongruous that, given that reticence, defendants now point to that letter as triggering preclusive "constructive knowledge" on plaintiffs' part.

We note finally, with respect to constructive knowledge, that plaintiff Powers *did* speak with Johnson about the letter and his references to "trespassers." And when she did, Johnson said nothing about the proximity of the nude beach. There is, again, an incongruity between that conduct and defendants' present position. In sum, plaintiffs did not have constructive knowledge that a nude beach abutted their property, and therefore did not "come to the nuisance."

■ Defendants argue, finally, that they cannot be liable for a private nuisance because plaintiffs have failed to prove that defendants did not undertake reasonable efforts to control intrusive displays of nudity and associated offensive conduct by beach users. We disagree. Immediately after plaintiffs moved to their property in 1990, and at all times thereafter, ODFW was well aware of plaintiffs' complaints about the pervasive and intrusive nudity, explicit sexual conduct, and trespasses committed by beach users. Nevertheless, as the trial court observed, defendants undertook "only the most limited steps to address this problem."

As noted previously, defendants' enforcement efforts were sporadic and, for the most part, ineffective. *See* 191 Or App at 570. ODFW personnel have not been detailed to enforce the nude beach boundaries and, particularly, to regulate compliance with the "buffer zone." The Columbia County deputy sheriff hired by ODFW was primarily assigned to fish and game enforcement.

Beyond those facts, the 1993 beach use plan, far from mitigating the interference with plaintiffs' use and enjoyment of their property, may have exacerbated the problems. Three years after plaintiffs began expressing their complaints, ODFW elected to place the only designated "clothing optional" beach in the wildlife area, which encompasses 12,000 acres and miles of Columbia River frontage, immediately adjacent to plaintiffs' property. Even then, ODFW failed to meaningfully implement mitigation measures that the plan specified, including the dissemination of pamphlets and other media informing beach users of restrictions on beach use. Further, when mitigation measures prescribed in the plan—*e.g.*, planting vegetation in the "buffer zone"— proved impracticable, ODFW failed to develop and implement workable alternatives. We thus affirm the trial court's determination that defendants failed to take reasonable steps to control the offensive uses on their property and, thus, are liable for the maintenance of a private nuisance.[6]

We turn finally, and briefly, to defendants' second assignment of error, which challenges the scope and content of the permanent injunction. Defendants contend that the mandatory provisions of the injunction offend principles of separation of powers in that those provisions are so directive that they impermissibly impinge on the prerogatives of ODFW, an executive agency, to select the means to perform its prescribed functions.

---

[6] ODFW suggests, in part, that its efforts should be deemed reasonable because it is impossible to eliminate acts of public indecency committed by beach users "without undertaking prohibitively expensive measures to constantly monitor and police the area." We appreciate that complete elimination of the offensive conduct may be extremely difficult, if not impossible. Nevertheless, ODFW's enforcement efforts to date have been woefully inadequate. Perfection is not required; reasonable enforcement efforts are.

We disagree. The terms of the trial court's injunction—*e.g.*, "defendant shall adequately staff the area in and around plaintiffs' property to adequately police compliance"; "defendant shall establish a buffer of sufficient length to avoid viewing of nude sunbathers on Collins Beach from plaintiffs' real property"; "defendant shall sufficiently sign the North boundary"—afford ODFW considerable flexibility in choosing the means by which the mandated ends are to be accomplished. We note, moreover, that, taken to its logical conclusion, defendants' position would preclude the issuance of mandatory injunctive relief against nuisances maintained under the auspices of state agencies; only the most broadly precatory "injunctions" would be constitutionally permissible. None of the reported decisions that defendants invoke sanctions such an extreme result.[7]

Affirmed.

---

[7] *See, e.g., Von Poppenheim v. Port. Boxing Com.*, 241 Or 603, 605, 407 P2d 853 (1965); *State ex rel. v. Newbry et al.*, 189 Or 691, 222 P2d 737 (1950); *Hyland v. City of Eugene*, 179 Or 567, 173 P2d 464 (1946); *Doughton v. Douglas County*, 90 Or App 49, 750 P2d 1174 (1988); *Milcrest Corp. v. Clackamas County*, 59 Or App 177, 650 P2d 963 (1982). None of those cases involved the maintenance of either a public or private nuisance by a public entity.