Argued and submitted November 13, 2019, at David Douglas High School, Portland, Oregon; decision of Court of Appeals affirmed, judgment of circuit court vacated, and case remanded to circuit court October 22, 2020

Olivia CHERNAIK,
a minor and resident of Lane County, Oregon;
Lisa Chernaik, guardian of Olivia Chernaik;
Kelsey Cascadia Rose Juliana,
a minor and resident of Lane County, Oregon;
and Catia Juliana, guardian of Kelsey Juliana,
*Petitioners on Review,*

*v.*

Kate BROWN,
in her official capacity as
Governor of the State of Oregon;
and State of Oregon,
*Respondents on Review.*

(CC 161109273) (CA A159826) (SC S066564)

475 P3d 68

Plaintiffs asserted that the Governor and the State of Oregon (the state) have, and have breached, a fiduciary duty under the public trust doctrine to protect a range of natural resources in Oregon, including the atmosphere, from substantial impairment caused by climate change. On remand from the Court of Appeals, the circuit court granted the state's motion for summary judgment on all of plaintiffs' claims for declaratory and injunctive relief and denied plaintiffs' motion for partial summary judgment. In plaintiffs' second appeal, the Court of Appeals concluded that the state does not have a fiduciary duty under the public trust doctrine to affirmatively protect trust resources from the effects of climate change. *Held*: Plaintiffs are entitled to a declaration that the public trust doctrine encompasses navigable waters and submerged and submersible lands underlying navigable waters; however, plaintiffs failed to establish that the state has a fiduciary duty under the public trust doctrine, based on common-law trust principles, to protect trust resources from the effects of climate change.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is vacated, and the case is remanded to the circuit court.

On review from the Court of Appeals.*

Courtney Johnson, Crag Law Center, Portland, argued the cause and filed the briefs for petitioners on review. Also on the briefs was William Sherlock.

_____

* On appeal from Lane County Circuit Court, Karsten Rasmussen, Judge. 295 Or App 584, 436 P3d 26 (2019).

Carson L. Whitehead, Assistant Attorney General, Salem, argued the cause and filed the brief for respondents on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Charles M. Tebbutt, Law Offices of Charles M. Tebbutt P.C., Eugene, filed the brief for *amici curiae* Michael Dembrow, Shemia Fagan, Lew Frederick, Jeff Golden, Ken Helm, Alissa Keny-Guyer, Karin Power, Floyd Prozanski, Andrea Salinas, Kathleen Taylor, and Marty Wilde. Also on the brief was Daniel C. Snyder.

Kenneth E. Kaufmann, Law Office of Kenneth Kaufmann, West Linn, filed the brief for *amici curiae* Randall S. Abate, Nadia B. Ahmad, Robert T. Anderson, Craig Anthony Arnold, Hope Babcock, Michael C. Blumm, Sara A. Colangelo, Kim Diana Connoly, Karl Coplan, John Davidson, Myanna Delinger, Rachele Deming, John C. Dernbach, Debra L. Donahue, Tim Duane, Richard Fink, Alyson C. Flourney, Denise D. Fort, Dale D. Goble, Carmen Gonzalez, Jaqueline Hand, Richard Hildreth, Hillary Hoffman, Oliver Houck, Blake Hudson, Sam Kalen, Helen H. Kang, Christine A. Klein, Kenneth T. Kristi, Katrina Kuh, Howard Latin, Ryke Longest, Kevin Lynch, Peter Manus, Patrick C. McGinley, David K. Mears, Errol Meidinger, Joel A. Mintz, Catherine A. O'Neill, Jessica Owley, Patrick A. Parenteau, Cymie R. Payne, Jacqueline Peel, Zymunt Jan Broel Plater, Ann Powers, Melissa Powers, Karl R. Rabago, Rick Reibstein, Kaylani Robbins, Jason Anthony Robison, Daniel John Rohlf, Jonathan Rosenbloom, Collette Routel, John Ruple, Erin Ryan, Shelley Ross Saxer, Amy Sinden, William Snape, Gus Speth, David Takacs, Gerald Torres, Clifford J. Villa, Elizabeth Kronk Warner, Charles F. Wilkinson, Robert A. Williams, Jr., Chris Wold, Mary Christina Wood, and Sandra Zellmer.

Elisabeth A. Holmes, Blue River Law, P.C., Eugene, filed the briefs for *amici curiae* 350 Corvallis, 350 Deschutes, 350 Eugene, 350 PDX, Ashland Food Co-Op, Beyond Toxics, Cascadia Action Network, Cascadia Wildlands, Churchill Climate Action Club, Citizens for Renewables of Coos County, City of Milwaukie, Clackamas Climate

Action Coalition, Climate Action Coalition, Climate Justice League, Climate Reality Project: Portland, Coconut Bliss, Earth Guardians 350 Club, Ecumenical Ministries of Oregon, Eugene Springfield NAACP, First Unitarian Church of Portland, Friends of the Columbia Gorge, Hair on Fire Oregon, Paul Holvey, Hummingbird Wholesale, Indivisible North Coast Oregon, Indow Windows, Interfaith Earthkeepers, League of Women Voters of Oregon, John Lively, Mount Pisgah Arboretum, Multnomah Youth Commission, OPAL Environmental Justice Oregon, ORD2 Indivisible, Oregon Environmental Council, Oregon League of Conservation Voters, Oregon Physicians for Social Responsibility, Oregon Unitarian Universalist Voices for Justice, Oregon Youth Legislative Initiative, Organically Grown Company, Partners for Sustainable Schools, Portland Youth Climate Council, Reverend Cecil Prescod, Riverside Community Church, Royal Blue Organics, Reverend Dr. Marilyn Sewell, Reverend John Shuck, Stop Fracked Gas PDX, Eric Strid, Temple Beth Israel, The Center for Sustainable Economy, The Green Energy Institute, The Raven Corps, The Sierra Club and its Oregon Chapter, The Village School, Thrive Hood River, Unitarian Universalist Church of Eugene, Mayor Lucy Vinis, and Willamette Riverkeeper.

Courtney Lords, Multnomah County Attorney's Office, Portland, filed the brief for *amici curiae* Multnomah and Lane Counties. Also on the brief was Jenny M. Madkour, County Attorney for Multnomah County.

Travis Eiva, Zemper Eiva Law LLC, Eugene, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Brian T. Hodges, Pacific Legal Foundation, Bellevue, Washington, filed the brief for *amicus curiae* Pacific Legal Foundation.

Before Walters, Chief Justice, and Balmer, Nakamoto, Flynn, Duncan, and Nelson, Justices, and Kistler, Senior Judge, Justice pro tempore.**

_____

** Garrett, J., did not participate in the consideration or decision of this case.

NAKAMOTO, J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is vacated, and the case is remanded to the circuit court.

Walters, C. J., dissented and filed an opinion.

**NAKAMOTO, J.**

Relying on an expanded view of the public trust doctrine, plaintiffs—two young Oregonians, concerned about the effects of climate change, and their guardians—brought this action against the Governor and the State of Oregon (collectively, the state). Broadly speaking, plaintiffs contended that the state was required to act as a trustee under the public trust doctrine to protect various natural resources in Oregon from substantial impairment due to greenhouse gas emissions and resultant climate change and ocean acidification. Among other things, plaintiffs asked the circuit court to specify the natural resources protected by the public trust doctrine and to declare that the state has a fiduciary duty, which it breached, to prevent substantial impairment of those resources caused by emissions of greenhouse gases. Plaintiffs also asked for an injunction ordering the state to (1) prepare an annual accounting of Oregon's carbon dioxide emissions and (2) implement a carbon reduction plan protecting the natural resources, which the court would supervise to ensure enforcement.

The circuit court granted the state's motion for summary judgment and denied plaintiffs' motion for partial summary judgment. The court concluded that no trial was needed, because the public trust doctrine did not encompass most of the natural resources that plaintiffs had identified and did not require the state to take the protective measures that plaintiffs sought. In 2015, the circuit court entered a general judgment dismissing the action, and the Court of Appeals vacated the judgment and remanded for the circuit court to enter a judgment, consistent with the Court of Appeals opinion, declaring the parties' rights. *Chernaik v. Brown*, 295 Or App 584, 601, 436 P3d 26 (2019).

On review, plaintiffs assert first that, as a matter of common law, the public trust doctrine is not fixed and, indeed, that it must evolve to address the undisputed circumstances presented, namely, that climate change is damaging Oregon's natural resources. They argue that the doctrine is not limited to the natural resources that the circuit court identified and, indeed, that the doctrine should cover other natural resources beyond those that have been

traditionally protected. Second, plaintiffs contend that at least some of the relief that they sought is permissible under the public trust doctrine, and the circuit court erred when it granted summary judgment to the state.

We hold that the public trust doctrine currently encompasses navigable waters and the submerged and submersible lands underlying those waters. Although the public trust is capable of expanding to include more natural resources, we do not extend the doctrine to encompass other natural resources at this time. We also decline, in this case, to adopt plaintiffs' position that, under the public trust doctrine, the state has the same fiduciary duties that a trustee of a common-law private trust would have, such as a duty to prevent substantial impairment of trust resources. Accordingly, we affirm the decision of the Court of Appeals, which vacated the judgment of the circuit court, and remand the case to the circuit court to enter a judgment consistent with this opinion.

## I.   FACTS AND PROCEDURAL HISTORY

Our review concerns the second phase of this long-running case, so we only briefly describe the first phase, an initial appeal and remand to the circuit court, as part of the procedural background. Plaintiffs sued the Governor and the State of Oregon in 2011. The state moved to dismiss the complaint on jurisdictional grounds. By agreement of the parties, the motion did not address the merits of plaintiffs' claims. The circuit court concluded that (1) plaintiffs' requested declaratory relief exceeded the court's authority under Oregon's Declaratory Judgment Act, (2) plaintiffs' claims were barred by sovereign immunity, (3) the requested relief violated the separation of powers doctrine, and (4) the suit presented political questions. Based on those conclusions, the circuit court granted the state's motion to dismiss.

Plaintiffs appealed, and the Court of Appeals reversed. The Court of Appeals concluded that plaintiffs were entitled to declarations on whether the atmosphere and other natural resources are public trust resources and whether the state, as trustee, has a fiduciary obligation to protect those resources from the impacts of climate change.

*Chernaik v. Kitzhaber*, 263 Or App 463, 481, 328 P3d 799 (2014).

The second phase of this case began on remand to the circuit court. In the prayer for relief in their amended complaint, plaintiffs sought four declarations:

"A declaration that the atmosphere is a trust resource, and that the State of Oregon, as a trustee, has a fiduciary obligation to protect the atmosphere as a commonly shared public trust resource from the impacts of climate change for Plaintiffs and for present and future generations of Oregonians."

"A declaration that water resources, navigable waters, submerged and submersible lands, islands, shorelands, coastal areas, wildlife, and fish are trust resources, and that the State of Oregon, as a trustee, has a fiduciary obligation to protect these assets as commonly shared public trust resources from the impacts of climate change for Plaintiffs and for present and future generations of Oregonians."

"A declaration that Defendants have failed to uphold their fiduciary obligations to protect these trust assets for the benefits of Plaintiffs as well as current and future generations of Oregonians by failing adequately to regulate and reduce carbon dioxide emissions in the State of Oregon."

"A declaration that the best available science requires carbon dioxide emissions to peak in 2012 and to be reduced by at least six per cent each year until at least 2050."

Plaintiffs also sought injunctive relief. They first requested an order requiring the state "to prepare, or cause to be prepared, a full and accurate accounting of Oregon's current carbon dioxide emissions and to do so annually thereafter." Second, plaintiffs asked for an order requiring the state "to develop and implement a carbon reduction plan that will protect trust assets by abiding by the best available science." In connection with their requested injunctive relief, plaintiffs requested "[t]hat [the circuit court] retain continuing jurisdiction over this matter for purposes of enforcing the relief awarded."

In its answer, the state admitted several of the scientific facts and future effects of climate change that

plaintiffs had alleged.[1] Overall, the state agreed that "global climate change is a very serious problem that is causing, and will continue to cause, harm to our planet and the State of Oregon, if global greenhouse gas emissions are not curtailed." The state then asserted four affirmative defenses: (1) plaintiffs failed to state a claim, (2) the matter was not justiciable, (3) the requested relief was barred by the political question doctrine, and (4) the requested relief was barred by principles of separation of powers. The parties then filed cross-motions for summary judgment.

In their motion for partial summary judgment, plaintiffs sought a ruling only on their entitlement to declaratory relief. Plaintiffs contended that they were entitled as a matter of law to four declarations, all of which had morphed from what was contained in the amended complaint.

First, plaintiffs sought a declaration concerning the scope of the public trust doctrine:

> "[The] State of Oregon, as a trustee and sovereign entity, has a fiduciary obligation to manage the atmosphere, water resources, navigable waters, submerged and submersible lands, shorelands and coastal areas, wildlife and fish as public trust assets, and to protect them from substantial impairment caused by the emissions of greenhouse gases in, or within the control of, the State of Oregon and the resulting adverse effects of climate change and ocean acidification[.]"

That requested declaration was not exactly stated in their amended complaint and instead was a combination and

---

[1] Among the scientific facts that plaintiffs alleged and that the state admitted were the following: Earth's average temperature has increased approximately 0.8 degrees Celsius in the last 100 to 150 years; human-caused fossil fuel burning and resulting climate change are already contributing to numerous adverse impacts to public health; climate changes are occurring faster than even the most pessimistic scenarios presented in 2007; and, if the atmosphere passes certain thresholds or tipping points, the existing climatic conditions that exist today cannot be restored.

The state also admitted that "global climate change" is likely to result in "some" (1) heating of the oceans and impacts on fisheries; (2) rising temperatures and weather changes that may lead to increased allergy and related health problems; (3) change to ecosystems from drought and rising temperatures and changes to Oregon's weather patterns; (4) loss of beaches and shorelines from erosion, rising sea levels, and the heating of the ocean and consequent impacts on fisheries and other sea life; and (5) reduced water availability, drought, increases in pests, rising temperatures, and weather changes.

reformulation of the first two declarations that plaintiffs had pleaded. Next, plaintiffs requested, with slight modifications, the third declaration included in their prayer for relief concerning defendants' breach of "fiduciary obligations":

> "A declaration that [d]efendants have failed, and are failing, to uphold their fiduciary obligations to protect these trust assets from substantial impairment by not adequately reducing and limiting emissions of carbon dioxide and other greenhouse gases in, or within the control of, the State of Oregon."

Finally, plaintiffs requested that the circuit court enter two additional declarations based on the premise that a specific carbon dioxide level in the atmosphere will lead to substantial damage to Oregon's natural resources:

> "A declaration that atmospheric concentrations of carbon dioxide ($CO_2$) exceeding 350 parts per million (ppm) constitutes substantial impairment to the atmosphere and thereby the other public trust assets[.]"

> "A declaration that to protect these public trust assets from substantial impairment, Oregon must contribute to global reduction in emissions of $CO_2$ necessary to return atmospheric concentrations of carbon dioxide to 350 ppm by the year 2100[.]"

Those declarations appear to be a refined version of a declaration included in their prayer for relief that the "best available science requires carbon dioxide emissions to peak in 2012 and to be reduced by at least six per cent each year until at least 2050." The specific carbon dioxide level seems to be based on an allegation in the amended complaint that "[t]o limit average surface heating to no more than 1° C (1.8° F) above pre-industrial temperatures, and to protect Oregon's public trust assets, the best available science concludes that concentrations of atmospheric carbon dioxide cannot exceed 350 parts per million or 'ppm.'"

Plaintiffs further noted that they would petition for supplemental relief in the form of an injunction if the court granted the requested declaratory relief. That injunction would require the state to (1) prepare an annual accounting of Oregon's greenhouse gas emissions and (2) develop and implement a greenhouse gas reduction plan that would

return atmospheric concentrations of carbon dioxide to 350 ppm by the year 2100. Plaintiffs also indicated their intent to request continuing supervision from the court.

The state moved for summary judgment on all of plaintiffs' claims for relief. The state's primary contentions were that the public trust doctrine does not extend to the atmosphere, or all waters of the state and fish and wildlife, and that the public trust doctrine does not impose fiduciary duties upon the state like those associated with traditional private trusts. In tandem, the state argued that, "[b]ecause there are no fiduciary duties associated with the common law public trust doctrine, any declaratory or injunctive relief based on an alleged violation of such duties must be denied." In addition, the state opposed injunctive relief, even were the court to recognize "new fiduciary duties," because, in its view, the court was being asked to violate the principle of separation of powers and to decide a political question entrusted to the legislative and executive branches of government.

In responding to plaintiffs' motion for partial summary judgment, the state highlighted the changes between what plaintiffs had included in the amended complaint and later sought in their motion for partial summary judgment. The state argued that the changes in requested relief demonstrated that plaintiffs themselves were unable to settle on what they thought the public trust doctrine required the state to do and that the declaratory relief they sought was too uncertain to be granted. Plaintiffs responded that the requested relief permitted the legislative and executive branches to fashion the specifics.

The circuit court denied plaintiffs' motion and granted the state's motion. The court concluded that the public trust doctrine encompasses only submerged and submersible lands—not navigable waters, beaches, other waters of the state, shorelands, islands, fish and wildlife, and the atmosphere. Next, the court examined the state's duties under the public trust doctrine. After observing that the public trust doctrine has historically only prevented the state from "entirely alienating submerged and submersible lands under navigable waters," the court determined that

the state does not have a fiduciary obligation under the public trust doctrine to protect public trust resources from the effects of climate change. The circuit court further concluded that granting plaintiffs' requested relief would violate the separation of powers doctrine. Based on those conclusions, the circuit court entered a general judgment of dismissal.

Plaintiffs appealed, and the parties presented arguments to the Court of Appeals that largely mirrored their arguments to the circuit court. Plaintiffs advanced two additional arguments, which the state disputed: The circuit court erred by treating all facts relating to climate change as "legislative facts" and applied an incorrect standard of review under ORCP 47, and the circuit court improperly had issued an advisory opinion on injunctive relief. For its part, the state added that the court should not consider plaintiffs' proposed declaration that "atmospheric concentrations of carbon dioxide ($CO_2$) exceeding 350 parts per million (ppm) constitutes substantial impairment," because it was not pleaded. But the state conceded that the circuit court had erred by stating the public trust doctrine too narrowly, because the doctrine also applies to the state's navigable waters.

The Court of Appeals did not decide the pleading dispute and rejected without discussion plaintiffs' assertion that the circuit court had applied an incorrect legal standard under ORCP 47 when it considered the parties' summary judgment motions. *Chernaik*, 295 Or App at 592 n 6. The court also did not decide what types of resources are protected by the public trust doctrine. *Id.* at 592, 596 n 10. The court only addressed "whether the state has fiduciary obligations under the public-trust doctrine to affirmatively protect public-trust resources from the effects of climate change," because its conclusion on that issue was dispositive. *Id.* at 592.

To address the state's duties under Oregon's public trust doctrine, the Court of Appeals first examined the historical underpinnings of the doctrine in Oregon. The court concluded from this court's case law that the doctrine has "served to place restraints on state action with respect to the lands it holds underlying navigable waterways to protect

the recognized public uses in those waterways," those uses being the public's right to navigation, commerce, fishing, or recreation. *Id.* at 594.

The Court of Appeals rejected plaintiffs' and *amici* law professors' reliance on out-of-state case law and on other sources of Oregon law, such as statutes, to support their understanding of Oregon's public trust doctrine. Instead, the court concluded, only Oregon's common law determines the contours of the doctrine. *Id.* at 596-97. As for Oregon case law, plaintiffs relied on *State v. Dickerson*, 356 Or 822, 835, 345 P3d 447 (2015), in which this court stated that, "[a]lthough the trust metaphor is an imperfect one ***, the state's powers and duties with respect to wildlife have many of the traditional attributes of a trustee's duties." The court found plaintiffs' reliance on *Dickerson* to be misplaced, explaining that that statement affirmed the state's authority to enact laws protecting wildlife, but that this court had not determined that the state had a *duty* to enact such laws. *Chernaik*, 295 Or App at 599-600.

Ultimately, the court determined that nothing in Oregon's public trust doctrine suggested that the doctrine imposed fiduciary obligations on the state to prevent damage to trust resources from the effects of greenhouse gases and climate change. *Id.* at 600. Instead, the court concluded that Oregon's public trust doctrine "is rooted in the idea that the state is *restrained* from disposing or allowing uses of public-trust resources that substantially impair the recognized public use of those resources." *Id.* (emphasis in original). Consistently with that conclusion, the Court of Appeals held that the circuit court had correctly granted the state's motion for summary judgment and denied plaintiffs' motion for partial summary judgment. However, because the case involved declaratory relief, the court determined that dismissal of the case was not the correct disposition. Therefore, it vacated the judgment and remanded for the circuit court to enter a judgment that declared the parties' rights.[2] *Id.* at 601. We allowed plaintiffs' petition for review.

---

[2] The circuit court issued a lengthy, detailed opinion and order that contained declarations at various points, but the judgment, which incorporated the opinion and order by reference, did not set out any declarations.

## II.   ANALYSIS

On review, the parties continue to dispute the scope of natural resources subject to the public trust doctrine and the state's obligations with respect to natural resources subject to the doctrine. Urging an expansion of the public trust doctrine, plaintiffs contend that the state has, and breached, fiduciary obligations to prevent impairments due to climate change with respect to a range of natural resources in Oregon. Although the state agrees that the natural resources in Oregon that plaintiffs describe have suffered some adverse effects of climate change brought on, in part, by carbon dioxide emissions, the state contends that the Court of Appeals correctly determined that the state does not have the obligations that plaintiffs claim and that plaintiffs overstate the range of natural resources subject to the public trust doctrine. Thus, we are presented with two questions on review: whether the public trust doctrine applies to other natural resources, beyond the submerged and submersible lands that the circuit court identified, and whether the public trust doctrine imposes a fiduciary duty upon the state to protect trust resources from the negative impacts of climate change.

## A.   *Resources Protected by the Public Trust Doctrine*

We begin with plaintiffs' argument that the circuit court erred in concluding that the public trust doctrine[3] applies only to submerged and submersible state lands. In their view, the public trust doctrine is a common-law doctrine that can and should be applied flexibly and expansively to protect a range of Oregon's natural resources, specifically, all the state's waters, wild fish and other wildlife, and the atmosphere.

As the state has correctly conceded, the public trust doctrine currently extends both to the state's navigable

---

[3] The term "public trust doctrine" gained widespread use following Joseph Sax's landmark article, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich L Rev 471 (1970). Although early Oregon cases do not use the term "public trust doctrine," we use that term throughout this opinion to remain consistent. The first Oregon case to use that term was *Morse v. Division of State Lands*, 34 Or App 853, 581 P2d 520 (1978), *aff'd*, 285 Or 197, 590 P2d 709 (1979).

waters and to the state's submerged and submersible lands. And, we agree with plaintiffs that the public trust doctrine, as a common-law doctrine, can be modified to reflect changes in society's needs. But whether the public trust doctrine is capable of expanding beyond its current scope and whether plaintiffs have established the legal grounds justifying an expansion of the doctrine in this case are two distinct questions. For reasons explained below, we reject plaintiffs' contention that this court should adopt an expansive test for determining protected trust resources and, applying that test, should hold that the public trust doctrine extends to all the waters of the state, wild fish and other wildlife, and the atmosphere in Oregon.

1.  *Currently protected resources*

As it stands today, the public trust doctrine applies to "navigable" waterways and the lands underlying those waterways. Under the doctrine, Oregon acquired title at statehood to "the lands underlying all bodies of water within the state that meet the federal test for navigability."[4] *Kramer v. City of Lake Oswego*, 365 Or 422, 438, 446 P3d 1, *adh'd to as modified on recons*, 365 Or 691, 455 P3d 922 (2019). Although title passed to the state "by virtue of its sovereignty, its rights were merely those of a trustee for the public." *Corvallis Sand & Gravel v. Land Board*, 250 Or 319, 334, 439 P2d 575 (1968) (quoting *Winston Bros. Co. v. State Tax Com.*, 156 Or 505, 511, 62 P2d 7 (1936), *cert den*, 301 US 689 (1937)).

In addition to the land underlying bodies of water that meet the federal test for navigability, the navigable waters themselves are a public trust resource. *See PPL Montana, LLC v. Montana*, 565 US 576, 590, 132 S Ct 1215, 182 L Ed 2d 77 (2012) (the people, "based on principles of sovereignty, 'hold the absolute right to all their navigable waters and the soils under them'" (citations omitted)); *Kramer*, 365 Or at 437 n 12 ("Water is not the only resources that the state holds in trust."); *Winston Bros. Co.*, 156 Or at

---

[4] Federal law governs any questions concerning navigability of waters—the criterion that determines whether Oregon acquired title to the underlying land at statehood—but state law determines what the public trust doctrine means for the resources it protects. *Kramer*, 365 Or at 437.

511 (ownership of land underlying waters "is that of the people in their united sovereignty, while the waters themselves remain public"). In *Kramer*, a case concerning the public's right to use Oswego Lake, we explained that the public trust doctrine is also partially codified by statutes that "declare that the waters of all navigable lakes are 'of public character' and that title to what the statute refers to as 'submersible and submerged lands' beneath navigable lakes is vested in the State of Oregon." 365 Or at 438-39. The statutes apply likewise to waters of navigable "streams."[5] Accordingly, the circuit court erroneously concluded that the scope of the natural resources subject to the public trust doctrine in its current form was limited to submerged and submersible state lands; the state's navigable waters are also subject to the public trust doctrine.

We reject plaintiffs' contention that this court previously has "recognized that the trust extends to waters and wild fish" as well as wild animals. In part, they rely on *Alsos v. Kendall et al.*, 111 Or 359, 227 P 286 (1924). In *Alsos*, this court explained that the state has "absolute ownership in and dominion over the bed and soil which underlies the tidal waters of the state" and "the waters themselves," and the state holds "in trust for its own citizens, title to and ownership of the fish in such waters, so far as they are capable of ownership while in a state of freedom * * *." *Id.* at 371. *Alsos* reiterates that navigable waters (at that time, based on the "ebb and flow of the tide" test) and underlying lands are subject to the public trust doctrine. The decision does not pertain to waters of the state generally, and it fails to support plaintiffs' position that the public trust doctrine extends to all waters of the state.

---

[5] ORS chapter 274 governs the submersible and submerged lands in the state. In relevant part, ORS 274.025 provides:

"The title to the submersible and submerged lands of all navigable streams and lakes in this state now existing or which may have been in existence in 1859 when the state was admitted to the Union, or at any time since admission, and which has not become vested in any person, is vested in the State of Oregon."

Relatedly, ORS 274.430 states that "[a]ll meandered lakes are declared to be navigable and public waters. * * * The title to the submersible and submerged lands of such meandered lakes, which are not included in the valid terms of a grant or conveyance from the State of Oregon, is vested in the State of Oregon."

As for wildlife, plaintiffs assert that, in *Dickerson*, this court affirmed several of its early decisions concluding that the state controls fish and wildlife "in its sovereign capacity for the benefit of, and in trust for, its people in common." According to plaintiffs, to the extent that this court's cases have differentiated between the public trust doctrine and what the parties and this court have referred to as a "wildlife trust" doctrine, *see Dickerson*, 356 Or at 834, "the legal concept is analogous" and no distinction between the two kinds of trusts is warranted.

We disagree. Although we have "long used the metaphor of a trust to describe the state's sovereign interest in wildlife," *id.*, and some similarities exist between the "wildlife trust" and the public trust doctrine, plaintiffs erroneously conflate the use of the trust metaphor with a conclusion that fish and wildlife are natural resources that are protected by the public trust doctrine. The two doctrines are currently separate and distinct doctrines. In contrast to the public trust doctrine, which provides that the general public has a right to use navigable waters for certain purposes—subject to objectively reasonable restrictions on that right—and which we later describe in more detail, the wildlife trust doctrine describes the state's broad authority over wild fish and animals in Oregon. The wildlife trust doctrine provides that the state has "the authority to manage and preserve wildlife resources," *id.* at 835, and that the legislature may restrict, prohibit, or condition the taking of game or fish in Oregon "as the law-making power may see fit," *State v. Pulos*, 64 Or 92, 95, 129 P 128 (1913).

2.   *The public trust doctrine as a common-law doctrine*

As a common-law doctrine, the public trust doctrine is not necessarily fixed at its current scope. It is within the purview of this court to examine the appropriate scope of the doctrine and to expand or to mold it to meet society's current needs, as we have done in the past. *See, e.g.*, *Horton v. OHSU*, 359 Or 168, 218, 376 P3d 998 (2016) ("[T]he common law is not inflexible but changes to meet the changing needs of the state."); *Re Water Rights of Hood River*, 114 Or 112, 180, 227 P 1065 (1924), *dismissed*, 273 US 647, 47 S Ct 245, 71 L Ed 821 (1926) ("The very essence of the common

law is flexibility and adaptability."). Indeed, from the earliest days of the doctrine in this country, the public trust doctrine has evolved in response to different circumstances and society's changing needs.

The public trust doctrine in the United States traces its roots to English common law. At English common law, the crown held title to the beds of "waters subject to the ebb and flow of the tide," but the public "retained the right of passage and the right to fish in the stream." *PPL Montana, LLC*, 565 US at 589. The crown asserted the same title to such resources in North America, and that title transferred to the original 13 states following the American Revolution. *Pacific Elevator Co. v. Portland*, 65 Or 349, 379, 133 P 72 (1913). Under the equal-footing doctrine, each new state after the 13 original states also acquired the same title to the beds of navigable waters within its borders. *PPL Montana, LLC*, 565 US at 591. Thus, upon statehood, each state—including Oregon—"gain[ed] title within its borders to the beds of waters then navigable," while the United States retained "any title vested in it before statehood to any land beneath waters not then navigable." *Id.*

Because of the vast geographic differences between North America and England, the English "ebb and flow of the tide" test excluded large bodies of waters in the United States from being considered navigable, meaning that the states did not gain title to those waters and land underlying them upon statehood. Those differences led some states to conclude that a state held "presumptive title to navigable waters whether or not the waters [were] subject to the ebb and flow of the tide." *Id.* at 590. But at first, Oregon adhered to the original "ebb and flow of the tide" test for purposes of determining whether it held title to the land under a body of water within its boundaries. Thus, in the late 1800s, this court's case law identified three classes of waters: (1) waters in which the tide ebbed and flowed, which were deemed navigable, with "all right[s] in [them] belong[ing] exclusively to the public," with the state owning the subjacent soil; (2) streams that were navigable in fact, which were considered public highways in which the public had an easement for navigation and commerce, with the title of the subjacent soil to the middle of the stream remaining with the riparian

owner;[6] and (3) streams that were so "small or shallow as not to be navigable for any purpose," in which the public had no right of use, which were considered "altogether private property." *Shaw v. Oswego Iron Co.*, 10 Or 371, 375-76 (1882). Although aware of the trend toward expanding the doctrine to "large fresh water rivers" that are "navigable in fact," the court in *Shaw* declined to answer whether Oregon should also follow that trend, *id.* at 377, 383, and concluded that the Tualatin River was "not a stream in which the tide ebbs and flows" and so, "in the common law sense," was "not navigable," *id.* at 376.

Over 35 years after *Shaw*, in *Guilliams v. Beaver Lake Club*, 90 Or 13, 175 P 437 (1918), this court addressed whether to expand the public trust doctrine to include waters that were not subject to the ebb and flow of the tide. In *Guilliams*, a case concerning the defendant's erection of a dam in a creek navigable by boat, this court reiterated the three classes of waters that it had previously described in *Shaw*. *Id.* at 19. It then stated: "To this list may be added our larger rivers susceptible of a great volume of commerce where the title to the bed of the stream remains in the state for the benefit of the public." *Id.* Thus, the first major advancement in Oregon's public trust doctrine was to adopt the nationwide trend abandoning the narrow ebb-and-flow test as the sole test of navigability and thereby expand the resources that were included in the public trust doctrine. *Cf. PPL Montana, LLC*, 565 US at 590 ("By the late 19th century, the Court had recognized the now prevailing doctrine of state sovereign title in the soil of rivers really navigable." (Internal quotation marks omitted.)).

The court in *Guilliams* also expanded the public trust doctrine in another way, by extending the concept of navigability—under what later would become known as the public use doctrine—to include "the use of boats and vessels for the purposes of pleasure." 90 Or at 27. To support that expansion, the court quoted with approval the reasoning from a Minnesota case that it viewed as having matching facts: "'To hand over all these [lakes that will probably never

---

[6] The public's easement for navigation and commerce on such waters is now referred to as the "public use doctrine." *Kramer*, 365 Or at 432-33.

be used for commerce] to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated.'" *Id.* at 29 (quoting *Lamprey v. Metcalf*, 52 Minn 181, 200, 53 NW 1139 (1893) (brackets added)).

This court has also expanded the levels of governmental bodies to which the public trust doctrine applies. We recently examined the public trust doctrine and the limitations it places on local governments. In *Kramer*, we held that "any limitations on the state's ability to interfere with the public's right to use the public trust waters are, similarly, limits on the city's authority." 365 Or at 447 n 22.

As the foregoing cases illustrate, at various points in Oregon's history, this court has adapted the public trust doctrine to address new situations as they arose. For over a century, this court has recognized that the public trust doctrine is a forward-looking doctrine that is flexible enough to accommodate future uses and to protect against unforeseen harms to the public's ability to use public trust resources.

But the earlier adaptations of the public trust doctrine all effectuate the core purpose of the doctrine: to obligate the state to protect the public's ability to use navigable waters for identifiable uses. That purpose appears in the early cases describing the doctrine. The United States Supreme Court explained that the doctrine is "founded upon the necessity of preserving to the public the use of navigable waters from private interruption and encroachment, a reason as applicable to navigable fresh waters as to waters moved by the tide." *Illinois Central Railroad v. Illinois*, 146 US 387, 436, 13 S Ct 110, 36 L Ed 1018 (1892). As we recently recognized in *Kramer*, the public trust doctrine "limits the state's authority to interfere with the public's right to use the public waters of the state." 365 Or at 449. Any restrictions by the state on the public's right of use "must be objectively reasonable in light of the purpose of the trust and the circumstances of the case." *Id.* at 449-50. And, this court has long emphasized that the state may not "sell or dispose of or grant the right to make any use of [the beds of navigable streams] which would impair or impede navigation." *Gatt v. Hurlburt*, 131 Or 554, 561, 284 P 172, *reh'g den*, 132 Or 415,

286 P 151 (1930); *see also Corvallis Sand & Gravel*, 250 Or at 334 ("[T]he state can make no sale or disposal of the soil underlying its navigable waters so as to prevent the use by the public of such waters for the purposes of navigation and fishing.").

Thus, the first adaptation of the doctrine to include waters not subject to the ebb and flow of the tide protected the public's use of the large bodies of water in the United States that were vital for commerce. The expansion of protected uses to include recreation was based on the recognition that "[a] boat used for the transportation of pleasure-seeking passengers is *** as much engaged in commerce as is a vessel transporting a shipment of lumber." *Luscher v. Reynolds*, 153 Or 625, 635, 56 P2d 1158 (1936). And finally, the expansion to include acts by local governments, *Kramer*, 365 Or at 447, similarly protects the public's paramount rights to use navigable waters in Oregon.

To summarize, the public trust doctrine is not fixed but is capable of change and expansion. The public trust doctrine has evolved from its original narrow conception, when it applied only to lands underlying waters subject to the ebb and flow of the tide. And although the expansions relate to different aspects of the public trust doctrine (protected resources, protected uses, and government actors), they all resulted from disputes involving a specific body of water and furthered the primary purpose of the doctrine—protecting the public's right to use navigable waters for fishing and navigation.

3.  *Plaintiffs' argument for expansion of the public trust doctrine*

We now turn to whether this case presents an opportunity to expand the scope of the doctrine based on plaintiffs' argument that the public trust doctrine should apply to other natural resources besides submerged and submersible lands underlying navigable waters and the navigable waters themselves. As noted at the outset, this case is not about a dispute concerning use or protection of any particular bodies of water; rather, plaintiffs allege a right to a judicial declaration that broadly expands the natural resources

subject to the public trust doctrine to include all waters of the state, wild fish and wildlife, and the atmosphere. The state maintains that the doctrine has historically been limited in scope and that plaintiffs have not established a basis for the court to expand the resources protected by the doctrine as plaintiffs request.

We first address plaintiffs' argument that the state has "reversed its positions regarding the scope of the natural resources protected under the public trust [doctrine] and its fiduciary duty to protect those resources," because if plaintiffs are correct, it may not be necessary to address plaintiffs' proposed test for expanding the public trust doctrine. In support of their argument, plaintiffs point to the complaint that the state filed in 2018 in the Multnomah County Circuit Court in *State of Oregon v. Monsanto Company*, No. 18CV00540. In that case, the state sought relief from Monsanto and others "in its sovereign capacity as trustee for all natural resources within its borders" and as a land owner, alleging environmental contamination and remediation costs due to PCBs (polychlorinated biphenyls) that Monsanto manufactured. Complaint at 4, *State of Oregon v. Monsanto Co., et al.*, Case No 18CV00540 (Multnomah Cty Cir Ct Jan 4, 2018). The state described its relationship to the natural resources within its borders in one paragraph of the complaint as follows:

> "The State holds in trust for the public the bed and banks, and waters between the bed and banks, of all waterways within the State. By virtue of its public trust responsibilities, all such lands are to be preserved for public use in navigation, fishing, and recreation. The State is also the trustee of all natural resources—including land, water, wildlife, and habitat areas—within its borders. As trustee, the State holds these natural resources in trust for all Oregonians—preserving, protecting, and making them available to all Oregonians to use and enjoy for recreational, commercial, cultural, and aesthetic purposes."

*Id.* at 5. Plaintiffs argue that that statement should be deemed a judicial admission, or, alternatively, that the state should be estopped from asserting a different position in the case at hand. Both arguments are without merit.

We reject the argument that the state's complaint against an unrelated party in another case can be considered a judicial admission in the present case. In *Borgert v. Spurling et al.*, 191 Or 344, 352, 230 P2d 183 (1951), this court quoted Wigmore's treatise on evidence to explain that "'[t]he pleadings in a cause are, for *the purposes of use in that suit*, *** judicial admissions *** and therefore a limitation of the issues.'" (Emphasis added; quoting IV Wigmore, Evidence, § 1064, 45 (3d ed).) Thus, this court concluded in *Borgert* that, as alleged in the complaint, it was "conclusively established for the purposes of this case" that a codefendant had parked his car in a certain location. *Id.*; *see also Vokoun v. City of Lake Oswego*, 335 Or 19, 21 n 1, 56 P3d 396 (2002) (although the defendant disputed a fact on appeal, this court treated a fact as established by judicial admission because the defendant had admitted that fact in its answer in that case).

Plaintiffs similarly fail to demonstrate the elements of judicial estoppel. Judicial estoppel requires a "benefit in the earlier proceeding, different judicial proceedings, and inconsistent positions." *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 611, 892 P2d 683 (1995). At least one of the three elements is not present in this case. Even assuming that the state's allegation in the *Monsanto* case is in an "earlier proceeding," the state's position in the present case is not "diametrically opposite" to the position that it has taken in the *Monsanto* case, as plaintiffs assert. In the *Monsanto* complaint, the state differentiates between resources that are public trust resources and other natural resources that it holds in trust, which is consistent with how this court has described the state's trust relationships in the past. And the complaint in *Monsanto* is in line with the state's position in this case about its obligations under the public trust doctrine—it has the *authority* to act in the manner plaintiffs request, but it cannot be compelled to take the requested actions. Because the state's position in the *Monsanto* case does not affect this proceeding, we turn to plaintiffs' other argument that the public trust doctrine should be expanded to include additional natural resources.

Plaintiffs have posited a test for expanding the types of natural resources that are subject to the public

trust doctrine. They identify two unifying features of public trust resources: "(1) they are not easily held or improved" and "(2) they are of great value to the public for uses such as commerce, navigation, hunting, and fisheries." Restating those two features, plaintiffs' proposed test for adding resources to the public trust doctrine would pose two questions: (1) Is the resource not easily held or improved? (2) Is the resource of great value to the public for uses such as commerce, navigation, hunting, and fishing? According to plaintiffs, a "yes" answer to each question would mean that the resource should be included under the doctrine as a public trust resource. Applying that test, plaintiffs conclude that the atmosphere qualifies as a public trust resource.

To back up their conclusion, plaintiffs assert that the atmosphere is "intricately linked with other trust assets, such as water" as a factual matter. But the interconnectedness of natural resources within Oregon (or of resources within and outside Oregon) does not mean that all natural resources, including the atmosphere, must be considered public trust resources under Oregon's public trust doctrine.[7] Plaintiffs do not provide a corresponding legal theory for including the atmosphere within the public trust doctrine, beyond the test that they propose.

Returning to plaintiffs' proposed test, we agree that plaintiffs' two factors are relevant considerations. But as the only two factors, they are insufficient because they fail to provide practical limitations. Indeed, the test that plaintiffs propose is so broad that it is difficult to conceive

---

[7] We do not imply that a factual connection between a condition or activity affecting a natural resource and adverse effects on a recognized public trust resource is irrelevant. In California, for example, litigants have sought to establish that the factual connection between governmental action involving one natural resource and resultant adverse effects on a particular recognized public trust resource can form the basis for relief under the public trust doctrine. *See, e.g.*, *Nat'l Audubon Soc'y v. Superior Court*, 33 Cal 3d 419, 437, 658 P2d 709, *cert den*, 464 US 977 (1983) (in action to enjoin city water department from diverting water that would ultimately flow into Mono Lake, explaining that the public trust doctrine in California "protects navigable waters from harm caused by diversion of nonnavigable tributaries"); *Environmental Law Foundation v. State Water Resources Control Bd.*, 26 Cal App 5th 844, 859, 237 Cal Rptr 3d 393 (Cal Ct App 2018) (involving whether state agency had a duty under the public trust doctrine to regulate extractions of groundwater that affected use of the Scott River, a navigable waterway).

of a natural resource that would not satisfy it. We do not foreclose the idea that the public trust doctrine may evolve to include more resources in the future. However, we decline to adopt the test that plaintiffs have urged us to use and, based on that test, to expand the resources included in the public trust doctrine well beyond its current scope.

B.   *Plaintiffs' Requested Remedies*

        Although we do not expand the scope of resources protected by the public trust doctrine using plaintiffs' proposed test, we address plaintiffs' requested relief. Based on the current scope of the protected resources and the state's duties under the doctrine, which we explain below, we conclude that, in this case, none of plaintiffs' requested relief is available beyond a declaration correctly stating that the doctrine applies to navigable waters and submerged and submersible lands.

        Plaintiffs sought four declarations in their motion for partial summary judgment. One requested declaration related to the atmosphere as a public trust resource:

> "A declaration that atmospheric concentrations of carbon dioxide ($CO_2$) exceeding 350 parts per million (ppm) constitutes substantial impairment to the atmosphere and thereby the other public trust assets[.]"

That requested declaration rests on the assumption that the atmosphere is a public trust resource. Because we have already concluded that it is not, no further discussion of that declaration is necessary.

        Plaintiffs also requested a declaration concerning both the scope of the resources covered by the doctrine and the state's duties:

> "[The] State of Oregon, as a trustee and sovereign entity, has a fiduciary obligation to manage the atmosphere, water resources, navigable waters, submerged and submersible lands, shorelands and coastal areas, wildlife and fish as public trust assets, and to protect them from substantial impairment caused by the emissions of greenhouse gases in, or within the control of, the State of Oregon and the resulting adverse effects of climate change and ocean acidification[.]"

Because that declaration in part concerns the scope of the resources covered by the public trust doctrine, and both plaintiffs and the state correctly point out that the circuit court erroneously omitted navigable waters as trust resources, plaintiffs are entitled to a declaration that the public trust doctrine applies to navigable waters and submerged and submersible lands. For the resources besides navigable waters and the submerged and submersible lands, plaintiffs' requested declaration fails to seek a form of relief that may be granted in this case.

That same declaration also would impose a "fiduciary obligation" on the state to protect trust resources, including navigable waters and submerged and submersible lands under those waters, from substantial impairment caused by climate change. That component of the requested relief presents two discrete issues: whether the state has a fiduciary obligation under the public trust doctrine and, if so, whether "substantial impairment" is the appropriate standard to evaluate the state's execution of its fiduciary obligation. We need only address the first issue.

Plaintiffs argue that courts "have consistently defined the state's relationship to the public and our shared natural resources as a 'trust.'" As a result, plaintiffs argue, this court should acknowledge the legal meaning that attaches to that word. As plaintiffs view it, common-law trust principles like those applicable to trustees of private trusts—including that trustees owe beneficiaries fiduciary duties—should guide an understanding of the state's duties to protect public trust resources under the public trust doctrine.

This court has described the state as filling the role of a "trustee" within the doctrine. *Winston Bros. Co.*, 156 Or at 511 ("[A]lthough the title [to the land underlying navigable waters] passed to the state by virtue of its sovereignty, its rights were merely those of a trustee for the public."). And we have previously relied on common-law private trust cases in explaining the state's role as trustee, declaring that "even when a trustee has discretion with respect to how trust property is managed, the trustee's actions must satisfy the 'general standard of reasonableness' in exercising

that discretion." *Kramer*, 365 Or at 446 (quoting *Rowe v. Rowe et al.*, 219 Or 599, 604, 347 P2d 968 (1959)).

But this court's case law cannot be read to conclude that all common-law principles of private trust law govern the public trust doctrine. Although some common-law principles of private trust law may be consistent with the public trust doctrine, *see, e.g.*, *Kramer*, 365 Or at 446 (recognizing the "basic principle of trust law" requiring a trustee to protect trust property and to manage trust property in a way that will benefit all trust beneficiaries), we observed in *Kramer* that "[n]either the legislature nor this court has mandated specific requirements or prohibitions to govern the state's management of the waters that it holds in trust for the public as a whole," *id*.[8]

Given the abstract nature of this litigation and this court's doctrines of judicial restraint and *stare decisis*, we reject plaintiffs' argument in this case that the public trust doctrine imposes obligations on the state like those that trustees of private trusts owe to trust beneficiaries. Plaintiffs' suggestion of a wholesale importation of generalized private trust principles to govern the state's obligations under the public trust doctrine could result in a fundamental restructuring of the public trust doctrine and impose broad new obligations on the state, beyond the recognized duty that the state has to protect public trust resources for the benefit of the public's use of navigable waterways for navigation, recreation, commerce, and fisheries. Accordingly, under the legal theory that they articulate in this case, plaintiffs are not entitled to their requested declaration that the state has fiduciary obligations under the public trust doctrine that require that this court declare that the state must protect

---

[8] The dissent misreads the idea in this paragraph of the opinion that "some common-law principles of private trust law may be consistent with the public trust doctrine" as tantamount to an acknowledgment that the state, as the trustee of public trust resources, has to comply with a generalized duty to protect trust resources for the benefit of trust beneficiaries, which the dissent then concludes encompasses a fiduciary duty to protect resources against the effects of climate change. 367 Or at 171 (Walters, C.J., dissenting); *see also id*. at 174 (citing *Kramer* for the same argument). That is the dissent's sole tie to the existing public trust doctrine, but this court has never extended the state's duties under the public trust doctrine that broadly—not in this case, not in *Kramer*, and not in any of the cases concerning the public trust doctrine since statehood.

public trust resources from the effects of climate change. That conclusion makes it unnecessary to address the state's secondary argument that imposing such duties would violate the principle of separation of powers.

Finally, plaintiffs request two additional declarations that are specifically related to carbon dioxide emissions, applying a "substantial impairment" standard to natural resources that are public trust resources as well as natural resources that are not:

> "A declaration that to protect these public trust assets from substantial impairment, Oregon must contribute to global reduction in emissions of $CO_2$ necessary to return atmospheric concentrations of carbon dioxide to 350 ppm by the year 2100[.]"

> "A declaration that [d]efendants have failed, and are failing, to uphold their fiduciary obligations to protect these trust assets from substantial impairment by not adequately reducing and limiting emissions of carbon dioxide and other greenhouses gases in, or within the control of, the State of Oregon."

Because we conclude that plaintiffs are not entitled to their requested declaration concerning the state's duties, we need not decide whether a "substantial impairment" standard and specific greenhouse gas emission limits should be used with respect to the duties that plaintiffs have contended the state has to protect public trust resources from the effects of climate change.

### III.    CONCLUSION

The public trust doctrine in Oregon currently encompasses submerged and submersible lands underlying navigable waters and the navigable waters themselves. We do not foreclose the possibility that the doctrine could expand to include other resources in the future, but the test that plaintiffs urge us to adopt sweeps too broadly. We also do not foreclose the possibility that the doctrine might be expanded in the future to include additional duties imposed on the state. However, even though the state acknowledges in briefing to the court that it recognizes the threats posed by climate change and that the state needs to do more to address those threats, plaintiffs have not developed a legal theory

that leads us to alter current law concerning the state's duty under the public trust doctrine. In this case, therefore, we do not impose broad fiduciary duties on the state, akin to the duties of private trustees, that would require the state to protect public trust resources from effects of greenhouse gas emissions and consequent climate change. Thus, we affirm the decision of the Court of Appeals and remand the case to the circuit court for entry of a judgment declaring the parties' respective rights, with instructions to include navigable waters as a public trust resource.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is vacated, and the case is remanded to the circuit court.

**WALTERS, C. J.,** dissenting.

All parties to this case, including the state, agree that climate change "is causing, and will continue to cause, harm to our planet and the State of Oregon." All parties to this case, including plaintiffs, agree that the legislative and executive branches of our state government have taken steps to address and prevent that harm. I conclude that the judicial branch also has a role to play: This court can and should determine the law that governs the other two branches as they undertake their essential work. This court can and should issue a declaration that the state has an affirmative fiduciary duty to act reasonably to prevent substantial impairment of public trust resources. Because the majority declines to issue that declaration in this case, I dissent.[1]

In doing so, however, I want to emphasize that the majority does not foreclose such a declaration in another case. *Chernaik v. Brown*, 367 Or 143, 166, 475 P3d 68 (2020). The majority begins by considering the natural resources to which the public trust doctrine applies and issues a declaration that it certainly applies to navigable waters and the submerged and submersible lands underlying those waters. The majority expressly does "not foreclose the idea that the

---

[1] I do not address the majority's conclusion that the public trust doctrine does not encompass natural resources beyond navigable waters and the submerged and submersible lands underlying those waters.

public trust doctrine may evolve to include more resources in the future." *Id.* The majority then goes on to consider two additional questions: "whether the state has a fiduciary obligation under the public trust doctrine and, if so, whether 'substantial impairment' is the appropriate standard to evaluate the state's execution of its fiduciary obligation." *Id.* at 167. Although the majority does not answer those two questions affirmatively, it expressly states that it does "not foreclose the possibility that the doctrine might be expanded in the future to include additional duties imposed on the state." *Id.* at 169.

As I see it, however, the time is now. This court already has recognized the state's duty to protect and preserve the natural resources to which the public trust doctrine applies and should declare that that duty exists; the reasons the majority gives for refusing to do so are not convincing. As to the first question—whether the state has a fiduciary obligation under the public trust doctrine—the majority sidles up to, if it does not affirmatively embrace, an affirmative conclusion. The majority confirms that the state has a "recognized duty" to "protect public trust resources for the benefit of the public's use." *Id.* at 168. And the majority acknowledges that that duty is consistent with the "'basic principle of trust law' requiring a trustee to protect trust property and to manage trust property in a way that will benefit all trust beneficiaries." *Id.* (quoting *Kramer v. City of Lake Oswego*, 365 Or 422, 446, 446 P3d 1, *adh'd to as modified on recons*, 365 Or 691, 455 P3d 922 (2019)). Rather than declaring that the state has that "recognized duty," however, the majority reframes the question. The majority characterizes plaintiffs' claim as one that seeks a broader declaration of the state's duty—requiring the "wholesale importation of generalized private trust principles to govern the state's obligations under the public trust doctrine"—and declines that invitation to *expand* the law. 367 Or at 168. The majority cites "the abstract nature of this litigation" and "this court's doctrines of judicial restraint and *stare decisis*" and concludes that "*under the legal theory that they articulate in this case*," plaintiffs are not entitled to the declaratory relief that they request. *Id.* (emphasis added). Then, having refused to declare the existence of a duty, the majority

correctly decides that it need not reach the second question presented—whether "substantial impairment" is the appropriate standard to evaluate the state's execution of that duty. *Id.* at 169. As I explain below, I would answer both of the pressing questions that this case presents, and I would answer them both affirmatively.

### THE PUBLIC TRUST DOCTRINE IMPOSES AN AFFIRMATIVE FIDUCIARY DUTY

I begin with my understanding of plaintiffs' argument on the first question presented—whether the state has a fiduciary obligation under the public trust doctrine. As I understand plaintiffs' position, they do not seek a declaration that the public trust doctrine incorporates all of the principles that apply to private trusts. Rather, they argue that, in deciding the nature of the obligation that the state has under the public trust doctrine, this court should consider, as it has in the past, the metaphor of a common-law trust. *See, e.g.*, *State v. Dickerson*, 356 Or 822, 834-35, 345 P3d 447 (2015) (explaining that the trust metaphor is used to describe the wildlife trust doctrine); *Kramer*, 365 Or at 437 n 12 (discussing *Dickerson* and noting that "water is not the only resources that the state holds in trust").[2] In fact, plaintiffs expressly state that "[w]hether or not [the public trust] obligation exactly mirrors the fiduciary roles under private trust law (including duties of loyalty and confidence) is not essential to the resolution of plaintiffs' claims." Instead, they "ask this court to declare that the public trust doctrine imposes an obligation on the state to protect and preserve trust resources."

---

[2] Similarly, the phrase "fiduciary duty," when used by the plaintiffs, is a way of describing what plaintiffs assert are the obligations the state owes the public when managing public trust resources. Plaintiffs assert that when they use the word "fiduciary," to describe the state's duty, they mean that the duty is "protective" in nature. Describing the state's obligation as a "fiduciary" one does not mean that the state is under the exact same obligations of that of a trustee of a common-law trust. *See* Tamar Frankel, *Fiduciary Law*, 71 Cal L Rev 795, 795-97 (1983) (noting that "[f]iduciaries appear in a variety of forms," and that "[c]ourts, legislatures, and administrative agencies increasingly draw on fiduciary law to answer problems caused by *** social changes"). In this case, the analogy to a "fiduciary" is helpful for illustrating the idea that the state holds title to public trust resources for the benefit of the public and that the state's obligations under the doctrine should reflect the benefits that the doctrine is aimed at achieving.

Given that understanding of the declaration that plaintiffs seek, I turn to the merits of the dispute and the state's arguments in opposition. With respect to the first question presented, the state argues that, to date, this court has applied the public trust doctrine only as a limit on state action alienating or restricting the use of public trust resources. The state contends that we should not expand the state's obligation to incorporate an affirmative duty to act.

I agree with the state's description of the factual context in which this court's public trust cases have been decided. We have decided that the public trust doctrine prohibits the state from taking action that restricts the public's use of public trust resources, but we have not been called upon to decide whether the public trust doctrine requires the state to take affirmative steps to protect those resources. Nevertheless, what we have said about that doctrine and its purpose leads me to conclude that the state's obligation is indeed one that requires affirmative action when the applicable standard is met.

The state holds resources to which the public trust doctrine applies in "trust" for the public.[3] *See, e.g.*, *Kramer*, 365 Or at 438 (noting that "this court's cases describe the public's right in terms of the beneficial interest of one for whom land is held in 'trust'"); *Corvallis Sand & Gravel v. Land Board*, 250 Or 319, 335-36, 439 P2d 575 (1968) (explaining that state holds title to public trust resources but title is held "not in a proprietary capacity, but in its sovereign capacity, that is to say, as trustee for the public"). The "core purpose" of the public trust doctrine is "to obligate the state to protect the public's ability" to use and enjoy those resources.[4] 367 Or at 161 (declining to adapt public

---

[3] Under Oregon law, a "trust" is simply an "obligation" that rests upon "a person by reason of a confidence reposed in him to apply or deal with property for the benefit of some other person." *Templeton v. Bockler*, 73 Or 494, 506, 144 P 405 (1914).

[4] This court clarified the nature of the public's rights in *Kramer*; however, the principle announced in that case was not a new one. *See Luscher v. Reynolds*, 153 Or 625, 635, 56 P2d 1158 (1936) (rejecting "navigability" test to determine what resources are protected by the public trust doctrine because "[t]here are hundreds of similar beautiful, small inland lakes in this state well adapted for recreational purposes, but which will never be used as highways of commerce in the ordinary acceptation of such terms"); *Guilliams v. Beaver Lake Club*, 90

trust doctrine to extend to more resources because it would not further core purpose of the doctrine); *see also Kramer*, 365 Or at 449 (explaining that the limits on the state's authority under the doctrine further the goal of ensuring the "public's right to use the public waters of the state"); *Winston Bros. Co. v. State Tax Com.*, 156 Or 505, 511, 62 P2d 7 (1936), *cert den*, 301 US 689, 57 S Ct 793, 81 L Ed 1346 (1937) (explaining that, "although title passed to the state by virtue of its sovereignty, its rights were merely those of a trustee for the public" and that the purpose of the trust doctrine was to ensure that the resources "remain public so that all persons may use them"); *accord Idaho v. Coeur d'Alene Tribe of Idaho*, 521 US 261, 285, 117 S Ct 2028, 138 L Ed 2d 438 (1997) (describing state's duty under public trust doctrine as an "obligation to regulate, improve, and secure submerged lands for the benefit of every individual"). That obligation is "consistent with a \*\*\* basic principle of trust law: that a trustee has a duty to protect trust property and to ensure, consistently with any requirements and prohibitions specific to the trust, that trust property is managed in a way that will benefit trust beneficiaries." *Kramer*, 365 Or at 446 (internal quotations omitted). In *Morse v. Oregon Division of State Lands*, 285 Or 197, 201, 590 P2d 709 (1979), this court relied on *Illinois Central R.R. v. Illinois*, 146 US 387, 13 S Ct 110, 36 L Ed 1018 (1892), and described that case as the "bellwether" of public trust cases. And in *Illinois Central*, the Court explained that the public trust doctrine "is founded upon the necessity of preserving to the public the use of navigable waters from private interruption and encroachment." 146 US at 436. Because the purpose of the public trust doctrine is to ensure the public's rights to use and enjoy public trust resources now and into the future, the doctrine must impose an obligation to protect and preserve them. To ensure the future use and enjoyment of public trust resources, the state must do more than refrain from selling public trust resources and restricting their use.

---

Or 13, 29, 175 P 437 (1918) (many lakes are not suitable for navigation but used for recreational purposes and "other public purposes which cannot now be enumerated or even anticipated" so to "hand over all these lakes to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent to which cannot perhaps, be new even anticipated").

The state must act reasonably to prevent their substantial impairment.[5]

Let me give some examples to illustrate circumstances in which the state may have a duty to act and this court may have a role in declaring and enforcing that duty. The state acknowledges that "[a] court has the power to prohibit state action that would unreasonably restrict the public's rights." Thus, if the state were emitting pollutants that were substantially interfering with the public's rights to use and enjoy a particular trust resource, then it would seem beyond contest that, on a plaintiff's allegations of harm, this court could and should declare that the state would have an obligation to act reasonably to prevent substantial impairment of that resource and to enter an injunction prohibiting the state from unreasonably emitting those pollutants.

Here, the alleged circumstances are different: Plaintiffs allege that actors other than the state are causing climate change, and plaintiffs do not allege that the state is wrongfully acting; they allege that the state is failing to act. The state contends that, in this circumstance, no declaration of its affirmative obligations is permitted. The state argues that the duty that the state owes under the public trust doctrine is a negative restriction only and that this court does not have authority to "compel state action."

But if the state knew that a particular third party was emitting a particular pollutant that was causing substantial impairment to a particular lake and thereby was interfering with the public's rights to use and enjoy that lake, I cannot imagine that this court would refuse to declare that the state had a fiduciary obligation to act reasonably to protect and preserve the lake from substantial impairment.

---

[5] Cases from other jurisdictions articulate the doctrine similarly. *See Pa Env. Def. Foundation v. Com.*, 640 Pa 55, 100, 161 A3d 911 (2017) (the public trust doctrine "impose[s] [a] fiduciary duty to manage the corpus of the * * * public trust for the benefit of the people to accomplish its purpose—conserving and maintaining the corpus by, *inter alia*, preventing and remedying the degradation, diminution and depletion of our public natural resources"); *In re Water Use Permit Applications*, 94 Hawai'i 97, 172-73, 9 P3d 409 (2000) (state's water permitting scheme was required to take into account the state's "affirmative duty under the public trust and statutory instream use protection scheme to investigate, consider, and protect the public interest in the flow of the Kahana stream").

Whether the state or a third party emitted the pollutant should not matter in the analysis. In either circumstance, the pollutant would harm the lake and interfere with the public's right to use and enjoy it.

When an entity has a duty to protect person or property from harm, the entity breaches that duty when it causes such harm. And an entity can cause harm either by acting or failing to act. *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987) (school could be held liable for negligence for injuries caused when student was attacked on school grounds where school knew of previous attacks and allegedly failed to provide proper supervision and security personnel, failed to warn, and failed to trim and remove vegetation where assailant hid); *see also Little v. Wimmer*, 303 Or 580, 739 P2d 564 (1987) (noting that the state has a duty to maintain public roadways it owns); *Stuhr v. Berkheimer Co.*, 220 Or 406, 349 P2d 665 (1960) (explaining that "an act or omission may be regarded as negligent [so long as] the person charged therewith [had] knowledge or notice that such act or omission involved [a risk of harm]" (internal quotation omitted)). In *Little*, for example, the state argued that it had no duty to remedy a dangerous condition on a roadway and could not be held liable for a failure to act. 303 Or at 584. We disagreed and explained that there was no dispute that the state was responsible for maintaining the intersection. *Id*. at 585. Therefore, we said, the question should be centered not on whether the state had a duty to maintain the intersection, but on whether the harm caused by the failure to do so was foreseeable. *Id*. Here, because the state has a duty to protect public trust resources and to preserve the public's rights to those resources, the state breaches that duty when it causes foreseeable harm, whether by acting or failing to act.

Here, again, the circumstances are different from the hypothetical posed: Plaintiffs allege that many actors are causing climate change and that many, if not all, public trust resources are being harmed. Those circumstances add complexity, but they do not change the nature of the state's fiduciary duty to protect public trusts resources for the public's use and enjoyment. Rather, those circumstances

may bear, as the state contends in its separation of powers arguments, on the degree to which a court is permitted to determine or is reasonably able to determine whether the state has fulfilled that duty.

Having taken the position that the state has an affirmative duty to protect public trust resources, it is incumbent on me to address the merits of the state's separation of powers arguments.[6] I am convinced that, despite the complexity of the problem posed by climate change, the judicial branch has an important constitutional role to play and should declare the governing law.

## DECLARING AN AFFIRMATIVE FIDUCIARY DUTY DOES NOT VIOLATE SEPARATION OF POWERS PRINCIPLES

The state advances two arguments based on separation of powers principles. First, the state argues that, with respect to climate change, a declaration of an affirmative, fiduciary duty to act would be fundamentally inconsistent with the allocation of responsibility outlined in Article III, section 1, of the Oregon Constitution, and would shift the balance of power between the branches or authorize the court to perform the functions of the other branches. Second, the state argues that the public trust doctrine does not supply judicially manageable standards for evaluating the state's compliance with that affirmative duty. I recognize that the responsibility for addressing climate change rests with the legislative and executive branches of our state government, and I recognize the complexity of the challenge they face. That does not mean, however, that our courts do not have a constitutional role to play.

One of the core functions of the judicial branch is to determine the legal authority and obligations of the other two branches of government. As this court said in *Pendleton School Dist. v. State of Oregon*, 345 Or 596, 609, 200 P3d

---

[6] As noted, having concluded that plaintiffs are not entitled to their requested declaration that the state has fiduciary obligations under the public trust doctrine, the majority—correctly—declines to address the second issue presented—"whether a 'substantial impairment' standard" is the appropriate standard to evaluate the state's execution of its fiduciary obligation to address the effects of climate change on Oregon's trust resources. 367 Or at 169.

133 (2009), it is this court's "obligation to determine what the law is." *See also Marbury v. Madison*, 5 US (1 Cranch) 137, 177, 2 L Ed 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Exercise of that authority does not violate separation of powers principles.

Article III, section 1, of the Oregon Constitution provides for separation of powers between the state's three branches of government. It provides:

> "The powers of the Government shall be divided into three separate branches, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these branches, shall exercise any of the functions of another, except as in this Constitution expressly provided."

Or Const, Art III, § 1. That provision "requires the three branches of state government to exercise their functions separately and exclusively." *Cascadia Wildlands v. Oregon Dept. of State Lands*, 365 Or 750, 764, 452 P3d 938 (2019). However, "[t]he separation of powers principle cannot in practice work absolutely; there is a necessary overlap between the governmental functions." *Sadler v. Oregon State Bar*, 275 Or 279, 285, 550 P2d 1218 (1976); *see also Putnam v. Norblad*, 134 Or 433, 438, 293 P 940 (1930) ("Practically, [the three branches] are not required to be kept entirely distinct, as their duties sometimes are blended or overlap."). In evaluating a separation of powers argument, "the appropriate inquiry is whether the action of another branch of government has interfered with [another] in a manner that prevents or obstructs the performance of [that branch's] irreducible constitutional task." *See State ex rel Metropolitan Public Defender v. Courtney*, 335 Or 236, 241, 64 P3d 1138 (2003) (applying the standard to question of legislative interference with judiciary's power); *Cascadia Wildlands*, 365 Or at 765 (noting that *Courtney* states the standard for finding a separation of powers violation). The separation of powers principle is therefore "not offended by choices that the other branches make, unless those choices unduly burden the capacity of [another branch] to perform its core function." *Courtney*, 335 Or at 241.

The state correctly does not contest the authority of the judicial branch to determine the authority and obligations of the other two branches, nor does it argue that a declaration of an affirmative fiduciary obligation to protect public trust resources would unduly burden their ability to perform their core functions. Rather, the state argues as follows:

> "How Oregon should respond to the global climate-change crisis is a policy question of immense importance and complexity. The political branches of government must answer that question in the first instance: the legislature passes laws, after a deliberative process to determine the appropriate course of action, and the executive enforces those laws and takes additional action through agencies. The Governor also has the power to exercise executive authority, as necessary and as authorized by law. The courts can then review laws for compliance with the constitution and can review executive actions for compliance with the law."

I agree, but I also contend that the courts can review the acts of the legislature and the Governor not only for compliance with the constitution and statutory law, but also for compliance with common-law dictates, including the common-law public trust doctrine. It is, after all, a core function of *this* branch to determine what the public trust doctrine requires, and, in exercising that authority, this court may determine that a legislative action which violates the principles of the public trust doctrine is invalid. *See, e.g.*, *Kramer*, 365 Or at 450 (holding that the city may not unreasonably interfere with the public's ability to enter the public water from abutting upland, and whether city's restrictions should be invalidated depended on a reasonableness test); *Winston Bros. Co.*, 156 Or at 511 ("[T]he state can make no sale of the soil underlying its navigable waters so as to prevent the use by the public of such waters for the purposes of navigation and fishing, but must hold them in trust for the public."); *Corvallis & Eastern R. Co. v. Benson*, 61 Or 359, 369-70, 121 P 418 (1912) (explaining that the state holds submerged and submersible lands underlying public-owned waters in trust for the people and that the state may not dispose of the lands abutting those resources if it would

materially interfere with the public's right to use those resources themselves).

Again, the state does not seem to take issue with that application of judicial authority; instead, the state argues against a consequence that it asserts necessarily will follow from a declaration of an affirmative fiduciary duty to protect against harm caused by climate change. The state argues that plaintiffs ask this court to compel the legislative and executive branches to make particular policy decisions, including, for example, adopting particular emissions targets. The state contends that if this court could compel the other two branches to take those actions, the judicial branch would wrongfully usurp the roles of the other two branches and the people of this state.

The state misunderstands or mischaracterizes the court's role in two important respects. First, the state confuses initial decisions about how to combat climate change— decisions only the legislative and executive branches can make—with a review of such decisions for their legality—a review that the judicial branch is charged to conduct. Second, the state fails to recognize that, in undertaking that review function, a court does not make its own policy decisions; instead, in the context of a challenge under the public trust doctrine, the court reviews the decisions of the state under an objective reasonableness standard. *See Kramer*, 365 Or at 450 (explaining that "the validity of the waterfront resolution depends upon whether the restriction on the public's right to enter the water *** is objectively reasonable under the circumstances").

It is true that, when a court determines that an initial decision made in another branch of government violates the constitution or other statutory or common law, that determination may have the effect of precluding the initial legislative or executive decision and may counsel another. *See State v. Ausmus*, 336 Or 493, 508, 85 P3d 864 (2003) (invalidating statute prohibiting disorderly conduct, *former* ORS 166.025(1)(e) (2003), after determining that phrase "congregates with other persons in a public place" was constitutionally overbroad); *see also* ORS 166.025(1) (current version of disorderly conduct statute does not include phrase

"congregates with other persons in a public place"). But a court's invalidation of a legislative or executive action or its determination that such an action does not meet a legal standard, including a common-law legal standard, does not violate separation of powers principles; it requires that the other two branches comport with the law.

Here, the applicable legal standard is objective reasonableness.[7] Under *Kramer,* this court evaluates whether government has violated the public trust doctrine not by substituting its own views of how best to protect and manage public trust resources, but by evaluating whether the government's acts or omissions are objectively reasonable. 365 Or at 446. Thus, this court may declare that the government has an affirmative fiduciary duty to protect public trust resources against the ravages of climate change without declaring that the state must meet specific emissions targets. And a trial court may determine whether the state breached its duty without explaining what the state would have had to do to comport with that duty. The question for a trial court would be whether the state took reasonable steps to fulfill its fiduciary obligation to protect Oregon's trust resources; the fact that the court may have taken different steps if it had been the policy maker would be immaterial.

The common-law doctrine of nuisance provides an example of the exercise of the court's review function. That doctrine requires that all property owners, including the government, maintain and manage property that they own such that they do not unreasonably interfere with the use and enjoyment of neighboring properties. *See Jacobson v. Crown Zellerback Corp.*, 273 Or 15, 18-19, 539 P2d 641 (1975) (to establish nuisance, plaintiffs were required to

---

[7] In *Kramer*, this court explained that the fiduciary duty to preserve and protect public trust resources is measured by an "objective test of reasonableness." 365 Or at 446-47, 450 (explaining that "whether a trustee's action is reasonable is an 'objective test of reasonableness in the circumstances'" and therefore that "the validity of the waterfront resolution depends upon whether the restriction on the public's right to enter the water *** is objectively reasonable under the circumstances" (quoting *White v. Public Employees Retirement Board*, 351 Or 426, 443, 268 P3d 600 (2011)). There are other fiduciary duties that may be measured by different standards, but those are not at issue here. *See Strickland v. Arnold Thomas Seed Service, Inc.*, 277 Or 165, 172-73, 560 P2d 597 (1977) (noting that there is a "rigid standard of behavior required" of a trustee under the "duty of loyalty and good faith").

show that invasion of their right "was unreasonable in the sense that the harm to plaintiffs is greater than they should be required to bear in the circumstances"). A court may declare that that duty exists, may evaluate whether governmental owners complied with that duty, and may even enjoin governmental action without violating separation of powers principles.

An example of the exercise of that judicial authority is found in *Mark v. ODFW*, 191 Or App 563, 84 P3d 155 (2004). There, the plaintiffs brought a nuisance claim against the state, the owner of a public beach adjacent to the plaintiffs' land. *Id.* at 573. The gravamen of the plaintiffs' claim was that the state "[had] failed to adequately control the conduct of [the state's] invitees" at the public beach. *Id.* (internal quotation omitted). On *de novo* review, the Court of Appeals found that on sunny days, hundreds, and occasionally, maybe even thousands, of naked adults visited the public beach and that sometimes those adults engaged in explicit sexual conduct in plain view of plaintiffs, and sometimes even did so on plaintiffs' own property. *Id.* at 574. The court concluded that the visitors' conduct "substantially and unreasonably interfered with plaintiffs' ability to use or enjoy their property," and rejected the state's argument that it could not be liable for nuisance because the plaintiffs had failed to show that it "did not undertake reasonable efforts to control intrusive displays of nudity and associate offensive conduct by beach users." *Id.* at 578. The court reviewed the state's "beach use plan" and found that far from mitigating the interference with plaintiffs' use and enjoyment of their property, may have exacerbated the problems. *Id.* at 579. The court affirmed the trial court's determination that defendants failed to take reasonable steps to control the offensive uses on their property and its issuance of a permanent injunction requiring the state to eliminate the nuisance. *Id.* at 565.

As a final matter, the court took up the state's arguments about the scope and content of that injunction—specifically, its requirements that the state "adequately staff the area in and around plaintiffs' property," "establish a buffer of sufficient length to avoid viewing of nude sunbathers on [the beach] from plaintiffs' property," and "sufficiently

sign the North boundary [of the state's property]." *Id.* at 572. The state argued that those terms violated principles of separation of powers because they impermissibly impinged on the prerogatives of the Oregon Department of Fish and Wildlife—an executive agency—"to select the means to perform its prescribed functions." *Id.* at 579. The Court of Appeals disagreed. It noted that the terms of the injunction afforded the Oregon Department of Fish and Wildlife "considerable flexibility in choosing the means by which the mandated ends are to be accomplished," and that the cases that the state had cited did not preclude the issuance of the injunction. *Id.* at 580.

Similarly, here, the state does not cite any cases limiting the authority of the judicial branch to declare the common-law obligations of the other two branches or to review their acts or omissions for compliance with the applicable legal standard. Here, the declaration of an affirmative fiduciary obligation to protect and manage public trust property would allow a court to review the actions or omissions of those in the legislative and executive branches for objective reasonableness, but the exercise of that review function would not necessarily usurp or interfere with the policymaking functions of the other two branches.

That brings me, finally, to the obstacle that all branches face when confronted with the magnitude of the problem presented by climate change—its scientific complexity. The state characterizes that complexity as raising questions of separation of powers without citing a case that makes that link. Instead, the state refers to a concern for a lack of "judicially manageable standards," using a phrase from *Baker v. Carr*, 369 US 186, 82 S Ct 691, 7 L Ed 2d 663 (1962). There, the Supreme Court characterized questions under the Guaranty Clause as "political questions" due, in part, to its view that that clause does not include "judicially manageable standards." *Id.* at 223 (explaining that the Guaranty Clause is not a "repository of judicially manageable standards which a court could utilize independently in order to identify a State's lawful government"). Here, the state does not contend that questions about whether the state has met its obligations under the public trust doctrine are "political questions" under *Baker*; rather, the state

seems to argue that a court's review of the state's compliance with its public trust obligations will require the court to evaluate the state's "policy" decisions. The state seems to assume that the proper standard of review would be review for abuse of discretion and seems to argue that review under that standard would require the court to make substantive "policy" decisions:

> "Attempting to apply such a standard to the complex policy decisions that are required in addressing climate change—decisions that invariably touch on a wide range of complex issues, including transportation, energy generation, energy efficiency, and a host of economic considerations—would require the court to make substantive policy decisions under the guise of a common law doctrine."

That argument is not persuasive. First, as discussed above, judicial review for compliance with the law may have the effect of invalidating a policy decision of another branch, but in exercising that function, a court does not itself make a policy decision. Second, this court reviews the state's compliance with its trust obligation to preserve and protect trust resources for objective reasonableness, not abuse of discretion.[8] Third, the fact that review for objective

---

[8] It is interesting that the state cites the *Restatement (Third) of Trusts* in support of its argument for an abuse of discretion standard, given its argument that this court should not consider general trust principles in deciding public trust cases. More importantly, the provisions that the state cites for that deferential standard are consistent with our decision in *Kramer* adopting an objective reasonableness standard. The state asserts that under general trust principles, "[w]hen a trustee has discretion with respect to the exercise of a power, its exercise is subject to supervision by a court only to prevent abuse of discretion." *Restatement (Third) of Trusts* § 87 (2007). Therefore, the state asserts, plaintiffs would have to show that the legislature or Governor acted outside "the range of legally correct discretionary choices" and that those actions did not result in a "permissible, legally correct outcome." *See State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000) (describing abuse of discretion standard of review). The *Restatement* provisions the state relies upon explain, however, that a "court will not interfere with a trustee's exercise of a discretionary power (or discretion not to exercise the power) when that conduct is reasonable." *Restatement* § 87 (comment b). The state appears to be conflating the use of the word "discretion" in the *Restatement (Third) of Trusts*, which is used to describe the idea that the trustee has considerable discretion in the ability to make the initial choices as to how a trust should be managed, with this court's standard of review for "abuse of discretion." As the *Restatement* explains, the question courts ask is whether the trustee's choices were reasonable, but that does not mean our standard of review when evaluating a trustee's decisions is for abuse of discretion. *See Restatement* § 87 (comment c) (noting that in "most of the litigation in which it is concluded that a trustee has

reasonableness requires consideration of "a wide range of complex issues," does not mean that such a review would offend separation of powers principles.

Judicial review of the legality of government action often requires consideration of a range of factors. *See, e.g.*, *State v. Rodriguez/Buck*, 347 Or 46, 58, 217 P3d 659 (2009) (when determining whether a sentence is so disproportionately severe that it "shocks the moral sense" of a reasonable person, this court considers "at least" three factors); *State v. Iseli*, 366 Or 151, 173, 458 P3d 653 (2020) (determination of whether state established unavailability of witness by showing pursuit of "reasonable means" to procure witness should be judged on the "totality of the circumstances" and "[t]hose circumstances encompass a wide range of factors"). Judicial review may even involve the balancing of competing interests. *See Busch v. McInnis Waste Systems, Inc.*, 366 Or 628, 650, 468 P3d 419 (2020) (invalidating statutory damages cap that violated Article I, section 10, and explaining that the legislature may modify common-law remedies but may only do so "for a reason sufficient to counterbalance the substantive right that Article I, section 10, grants"). That those exercises are difficult does not, however, preclude their undertaking.

And the same is true even when a court reviews governmental action for an abuse of discretion. A court also conducts review for abuse of discretion without substituting its own substantive policy decisions. *School Dist. No. 17 v. Powell*, 203 Or 168, 191, 279 P2d 492 (1955) (discussing abuse of discretion standard of review of school board decisions and noting that "[c]ourts can interfere only when the board refuses to exercise its authority or pursues some unauthorized course," and that a "[d]ifference in opinion or judgment is never a sufficient ground for interference" (internal quotation omitted)).

I turn now to the state's final argument, which is that if plaintiffs prevail, "then the courts would be hopelessly

---

committed an abuse of discretion involves a finding that the trustee, in exercising a power, has acted unreasonably"). As we explained in *Kramer*, under Oregon law, "whether a trustee's action is reasonable is an 'objective test of reasonableness in the circumstances.'" 365 Or at 446-47 (quoting *White*, 351 Or at 443).

entangled in the discrete policy decisions that are entrusted to the legislative and executive branches by the constitution." That is problematic, according to the state, because courts are "ill equipped to balance such policy concerns." I disagree. The complexity of an issue may make a judicial decision more difficult, but it does not permit this court to abdicate its role.

Consider, for example, the Eighth Amendment prohibition on "cruel and unusual punishment." As the United States Supreme Court has explained, "'[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of man.'" *Brown v. Plata*, 563 US 493, 510, 131 S Ct 1910, 179 L Ed 2d 969 (2011) (quoting *Atkins v. Virginia*, 536 US 304, 311, 122 S Ct 2242, 153 L Ed 2d 335 (2002)). Determining whether a state has violated a prisoner's Eighth Amendment rights and how to remedy a violation requires a weighing of imponderables and a review of expert decision-making:

> "To incarcerate, society takes from prisoners the means to provide for their own needs. Prisoners are dependent on the State for food, clothing, and necessary medical care. A prison's failure to provide sustenance for inmates may actually produce physical torture or a lingering death. Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.

> "If government fails to fulfill this obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation. Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals."

*Id*. at 510-11 (internal quotations and citations omitted).

In the two consolidated cases that the United States Supreme Court discussed in *Plata*, a Special Master and a Receiver had struggled for over 10 years to oversee efforts to remediate the unconstitutional conditions in the California

prisons that had resulted in "overwhelming evidence of the systemic failure to deliver necessary care to mentally ill inmates" and an "unconscionable degree of suffering and death." *Id.* at 506-07 (internal quotation omitted). But, as the Court explained, the need for deference to experienced and expert prison administrators faced with that difficult task did not give courts an out:

> "Courts nevertheless must not shrink from their obligation to enforce the constitutional rights of all 'persons,' including prisoners. Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."

*Id.* at 511 (internal quotation and citation omitted).

Courts also must not shrink from their obligation to enforce the rights of all persons to use and enjoy our invaluable public trust resources. How best to address climate change is a daunting question with which the legislative and executive branches of our state government must grapple. But that does not relieve our branch of its obligation to determine what the law requires. *See* Alfred T. Goodwin, *A Wake-Up Call for Judges*, 2015 Wis L Rev 785, 788 (2015) ("As a coequal branch of government, the [judicial] branch must enforce the legislature's obligation to preserve the public trust."). We should not hesitate to declare that our state has an affirmative fiduciary duty to act reasonably to prevent substantial impairment of our public trust resources. I respectfully dissent.